A94A0566, A94A0567. MILLER et al. v. RIESER et al.; and vice versa.
(446 SE2d 233)

BEASLEY, Presiding Judge.

Joscelyn Rieser was born on June 21, 1982, of Mary and Ray Rieser. Since 1987, when she reached age five, Joscelyn has lived in Atlanta with her maternal grandmother Rosalind Miller. The Riesers are divorced, and Mary resides in California. In August 1991, Mary came to Atlanta and announced she was taking nine-year-old Joscelyn back to California.

*Course of the litigation*

On August 19, 1991, the grandmother filed a petition against the parents, seeking permanent custody of the child and asking that the parents be temporarily restrained and enjoined from removing her from the custody of the grandmother or the jurisdiction of the court. She alleged that the parents are unfit custodians; that they failed to meet the child's physical, mental, and emotional needs; and that they lost parental power under OCGA § 19-7-1 (b) (3) and (b) (6) by their failure to provide necessaries, by abandonment, and by cruel treatment. The court granted the temporary restraining order. The grandmother later amended her petition by adding a request that she be granted visitation for an extended period each year if the court declined to give her custody.

A guardian ad litem was appointed to represent the child's interests, on the father's motion, and the parents moved for summary judgment based on the evidence of record. The court denied the parents' motion on the issue of whether parental control had been lost under OCGA § 19-7-1 but granted it on the issue of parental fitness, concluding that there was no genuine issue of material fact as to the present unfitness of either parent. In an order denying reconsidera-

tion of this ruling, the court distinguished other appellate cases which involved past behavior of parents towards the child which related to present unfitness and concluded that the evidence in this case was not comparable.

Following a lengthy trial, the court entered final judgment on July 29, 1993. It states that the grandmother seeks custody under OCGA § 19-7-4 as well as § 19-7-1 (b) (3) and (b) (6). The court confirmed the summary judgment on the issue of present unfitness, found that the child had not been legally abandoned by the parents, and found that it had not been established by clear and convincing evidence that they failed to furnish necessaries or are chargeable with cruel treatment so as to have lost parental power. However, the court did find that it is in the child's best interest to spend significant time with the grandmother. Until August 1, 1994, she was granted visitation with the child several hours each Monday and Wednesday, every other weekend, and four consecutive weeks during the summer. The court ordered the mother to remain with the child in the Atlanta area at least until the beginning of August 1994. In the event she and the child subsequently move more than 150 miles from Atlanta, the grandmother is granted visitation for five consecutive weeks during the summer and parts of holidays.

We granted the grandmother and the guardian ad litem's application for discretionary appeal of the summary judgment for the parents on the issue of parental fitness. Case No. A94A0566 is their appeal of that order. Case No. A94A0567 is the parents' appeal of the court's grant of visitation to the grandmother. Most of the trial record, but not the transcript of the trial, has been transmitted to this court.

### Evidence

Since the issue in the grandmother's and guardian ad litem's appeal is whether summary judgment was proper for the defending parents, the evidence is viewed in the light most favorable to the non-moving petitioner. "The party opposing the motion . . . is entitled to all favorable inferences and the benefit of every doubt, and the evidence is construed most strongly in its favor. [Cit.]" *Dixieland Truck Brokers v. Intl. Indem. Co.*, 210 Ga. App. 160, 163 (3) (435 SE2d 520) (1993); see, e.g., *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). Although this case has now been tried, albeit not on the fitness issue, we apply this evidence rule to that which was presented to the trial court before its ruling on summary judgment. *Meade v. Heimanson*, 239 Ga. 177, 180 (236 SE2d 357) (1977); *Lawal v. Stanley Bostitch Co.*, 209 Ga. App. 439, 440 (433 SE2d 706) (1993); *Dove v. Nat. Freight*, 138 Ga. App. 114, 117 (6) (225 SE2d 477) (1976).

From May 1983, when the child was less than a year old, until September 1984, the parents failed to adequately clothe her in cool weather, so that her feet turned blue. They failed to adequately feed her, so that when she was first taken to visit others, she ate ravenously and gained many pounds. They failed to properly clean her, so that she had eczema behind her ears and sores in her diaper area. They failed to take her to the doctor for well baby check-ups or immunization. They failed to have a laceration suture removed from her knee, causing inflammation and scarring. They failed to see that she got proper rest; she slept for unusually long periods of time at the beginning of each visit with others.

The paternal grandfather is Dr. James Rieser, a family practice physician. When the child was first taken to visit him and his wife, the step-grandmother, she had totally flat affect and did not interact with them, laugh, smile, or speak, although she is a bright child. He opined that she was suffering from a condition known as failure to thrive, which is often the result of lack of parental care and attention. He testified that the father admitted to him that he did not know how to take care of the child.

Although the mother testified that using her training and experience as a nurse, she took care of the child, giving her vitamins and good food, and she was very rarely ill, Dr. Rieser testified that without request, he immunized the child and provided pediatric medical care.

In September 1984, the parents left the child with grandfather Rieser in order to make a trip to California for several months. Shortly after Thanksgiving in 1984, the father took the child to grandmother Miller without any prearranged plans and left her there. She took care of the child until after Christmas, when the mother returned from California. During that month, the father did not care for the child and visited her infrequently. She cried repeatedly for grandfather Rieser and his wife. Beginning in January 1985, the child began staying with grandmother Miller on the weekends and spending the weekdays with her parents. Her parents separated in 1986, and the father moved to California. He did not see or speak to the child again until the summer of 1989. The mother remained in Atlanta. The parents' 1988 divorce decree makes no provision for the custody or support of the child.

The mother testified that when the child lived with her, she generally would keep her during the day and leave her with babysitters at night. The grandmother testified that one of the babysitters was mentally unstable, had thrown the child on the floor, and had taken her to pornographic movies and to prostitutes. The child likewise testified that the babysitter had hurt her by throwing her on the floor. Her mother laughed when she told her about this.

The child testified that when she and her mother lived together, her mother would be either asleep or at her boyfriend's house when she awoke in the morning. She was frightened when she awoke and no one was there. She would have to pester her mother in order to get her to make her something to eat, which at times she would not do. When she was at the mission where the mother worked, many times her mother was not there when she got hungry. When that happened, she would beg other people for money, go to the drugstore, and get candy to eat. At night, she would sleep on the floor if she was tired. She would stay at the mission until 1:00 to 3:00 a.m. If her mother was not there, she would ask someone else to take her home. The grandmother testified that she would often find the child running around the mission unsupervised or asleep on the floor, and that upon coming to her house for the weekend, she usually slept the first 24 hours.

In the summer of 1987, the step-grandmother informed the mother that the child had four cavities. The mother said she would take care of it but did not do so. When the child next saw a dentist whom the step-grandmother had taken her to, she had four additional cavities. The step-grandmother paid for fillings.

In the fall of 1987, the grandmother enrolled the child in kindergarten after the mother failed to do it. The child began living with the grandmother and spending weekends with the mother, who picked her up from kindergarten on Friday afternoons. The grandmother pleaded with her to go there on other occasions such as to have lunch with the child or see her perform in a program, but she said she did not have time.

On one occasion, the child got chicken pox, and the grandmother left her in the mother's care. The mother left her in the care of a teenage boy who neglected her. She called her mother and asked her to come take care of her, but she said she was too busy. On another occasion, she got the flu and the mother again said she was too busy to see her.

In the spring of 1989, the mother moved to California. Afterward, she saw the child only sporadically. The mother sometimes telephoned the child, but sent no presents at Christmas or on her birthday and showed no interest in her development. Beginning in the summer of 1989, the father began to telephone the child, infrequently; he also did not send cards or presents for her birthday, Christmas, or other holidays. While the child lived with the grandmother, she was supported by her grandparents.

A psychologist who has seen the child since May 1990 testified that she is not significantly bonded to her mother and has not bonded at all to her father; that due to her mother's lengthy pattern of neglecting her physical and emotional needs, she is afraid of leaving

her grandmother and returning to her mother; and that if removed from the security and stability of her present environment, she could withdraw, become severely depressed, and regress academically. This psychologist also testified that when a parent has established a lengthy pattern of neglecting the physical and emotional needs of a child, the pattern is unlikely to change and most probably would continue.

The psychologist acknowledged that the child enjoys and wants to see her parents and establish a relationship with her mother, and that she is comfortable with overnight visitation. After this litigation began, a parental visitation schedule was established, and the grandmother testified that it worked well. With this view of the evidence, none of which was conclusively overcome by defendant's evidence, we confront the current legal issue.

1. The grandmother and the guardian ad litem contend that the court erred in ruling that there is no genuine issue of material fact as to the parents' present unfitness, based on the evidence of past conduct and likelihood of continuation. In erring, they contend, the court misapplied ruling case law in comparable cases.

"On motion for summary judgment, the burden is on the movant . . . to establish the absence of any genuine issue of material fact and its right to [prevail] as a matter of law. OCGA § 9-11-56 (c); *Kinney* [*v. American Mfg. Mut. Ins. Co.*, 189 Ga. App. 882, 883 (377 SE2d 900) (1989)]." *Dixieland Truck Brokers*, supra at 163 (3).

Where a third party seeks to obtain custody of a child, the trial court must find by clear and convincing evidence that the parent is presently unfit, *Blackburn v. Blackburn*, 249 Ga. 689 (292 SE2d 821) (1982), or otherwise not entitled to custody under OCGA §§ 19-7-1 and 19-7-4. *In the Interest of C. T. L.*, 182 Ga. App. 845 (357 SE2d 298) (1987). A determination of unfitness, which is the only question here, must be based on the parent's present condition, *Bozeman v. Williams*, 248 Ga. 606, 607 (285 SE2d 9) (1981), and relates to the child's welfare. *Perkins v. Courson*, 219 Ga. 611, 617 (2) (135 SE2d 388) (1964).

The parental fitness doctrine is intended to cover cases where a parent has not forfeited or relinquished his or her parental rights by any of the modes prescribed by statute but for some other reason has been shown to be an unfit parent. *Perkins*, supra at 623 (2). It focuses on a parent's character, *Proctor v. Proctor*, 164 Ga. 721 (139 SE 531) (1927), "habits and conduct." *Perkins*, supra at 614. *Peck v. Shierling*, 222 Ga. 60 (148 SE2d 491) (1966), speaks of "unfitness for the trust."

If summary judgment is ever proper when the challenge is parental fitness, which for one thing is not a jury question, it is not proper here. We doubt its utility on this subject because, to dispose of a case,

or in this instance an issue, in this expedient before-trial manner, the undisputed evidence must preclude a finding of unfitness as a matter of law. OCGA § 9-11-56 (c). Although "unfitness" vel non is a question of fact, to reach such a finding inherently requires an application of discretion. It is not like finding the light was red or green, an objective fact, but requires the application of judgment, within certain defined boundaries. Here, were a court to find unfitness, we could not conclude it erred as a matter of law. Likewise, if the evidence recited constitutes the facts in the case, it does not show an absence of evidence to support the non-moving party's case on the question of fitness, applying the test of *Lau's Corp.*, supra at 491 and 495. Moreover, because the question of custody is based in part on discretion, summary judgment, which precludes the intangible side of live testimony, is ill-suited for the resolution except in "clear, plain, and palpable cases." Cf. *Lozynsky v. Hutchinson*, 159 Ga. App. 715 (285 SE2d 70) (1981).

In this case, there is a long history of character, habits, and conduct showing an unconcerned attitude towards the child, lack of interest and attention, thoughtlessness, failure to understand a child's basic nurturing needs, and unconcerned reliance on others to fulfill parental responsibility. These bring into question the parent's priorities when measuring self versus child. Although the history of the relationship and interaction or absence thereof between the parents and the child is relevant to the statutory issues of abandonment, cruel treatment, and failure to provide necessaries, the script written over time by the parents is also relevant to the issue of their present fitness. The statutory grounds focus on the child, whereas the judicially created ground focuses on the parent. *Carvalho v. Lewis*, 247 Ga. 94 (274 SE2d 471) (1981), reiterated that "[a] finding of unfitness must center on the parent alone, that is, can the parent provide for the child sufficiently so that the government is not forced to step in and separate the child from the parent . . . The ability of a parent to raise his or her child . . . must be examined in a scrutinous, abstract light." This, of course, must be jealously guarded so as not to categorize as unfit those who have unconventional values.

Unlike those cases where there was evidence of *change* of detrimental past conditions so as to show present fitness, here there was none. Instead, there is expert testimony that a lengthy pattern of child neglect is unlikely to change. Thus, there is more than merely evidence of past unfitness, which standing alone would not be sufficient. *Blackburn*, supra at 692.

While decisions such as *Bozeman*, supra; *Durden v. Barron*, 244 Ga. 277, 279 (260 SE2d 17) (1979); *Shaddrix v. Womack*, 231 Ga. 628, 632 (6) (203 SE2d 225) (1974); *Heath v. Martin*, 225 Ga. 181, 182 (2) (167 SE2d 153) (1969); *In the Interest of S. K. L.*, 199 Ga. App. 731,

733 (1) (405 SE2d 903) (1991); and *In the Interest of R. L. L.*, 192 Ga. App. 869 (386 SE2d 852) (1989), do not expressly recognize this doctrine, they are in conformity with it.

In *Heath* and *Shaddrix*, the only evidence showing or tending to show unfitness related to occurrences some years prior to the date of the trial, and other undisputed evidence showed changes which the parents had made in their lives since the prior years which rendered them fit parents. In both cases, the Supreme Court held that there was insufficient evidence of present unfitness. In *Bozeman*, supra at 607, "there [was] ample evidence that the mother's condition [had] changed for the better. . . ." However, in *Durden*, the Supreme Court held that the trial court did not abuse its discretion in finding the parent presently unfit, when there was evidence of unfitness based on past conduct and indifference to the child and there was conflicting evidence as to the parent's present condition. In *R. L. L.*, this court referred to evidence of the father's past involvement in drug use and held that whether his treatment caused a present abatement of his addiction was an issue for determination by the factfinder on the basis of all the evidence. Also referring to evidence showing a continued absence of financial support of the children, the court in *R. L. L.* found competent evidence supporting a finding of present unfitness. *S. K. L.* recognized the general rule that while past deprivation is not sufficient for termination of parental rights without a showing of present deprivation, the past conduct of the parent is properly considered by the court in determining whether such conditions of deprivation are "likely to continue." Id. at 733. See OCGA § 15-11-81 (b) (4) (A).

In this case, the court in ruling on summary judgment merely distinguished the cases relied on by petitioners as involving "long established patterns of extremely destructive and neglectful behavior." That is a matter of degree, the category of fitness is broad, *Perkins*, supra at 623-624 and a factfinder could find the circumstances here constitute just such a pattern. While the question of fitness is based on *present* fitness, it is affected by what has gone on before to bring the parent and child to this point, and it obviously involves a determination which has significance only in the future, for it is the child's custody from the time of the judgment forward that is at stake.

The evidence relied upon by the grandmother and the guardian ad litem creates genuine issues of material fact as to the parents' present fitness as parents. Although the third party has a heavy burden when seeking the legal custody which ordinarily belongs to the parents, who have the right by law to custody in the absence of a statutory ground or unfitness, the evidence does not fall short *as a matter of law* from challenging that strong legal right. On the record before us, the parents have not shown that the issue is nonexistent,

*Lau's Corp.*, supra, either by proof that the appellants' evidence is not true or by proof that they are currently fit.

The trial court as the factfinder in this case may not be persuaded that this evidence meets the clear and convincing evidence test, but it is not such evidence which *no* factfinder could accept as the basis for a finding of unfitness, exercising its discretion. The court erred in granting partial summary judgment in the parents' favor and foreclosing this issue from trial.

2. The parents argue that the main appeal should be dismissed as to the guardian ad litem, for lack of standing to appeal.

Where a minor is interested in pending litigation and has no guardian or the minor's interest is adverse to that of the guardian, the court may appoint a guardian ad litem for the minor. OCGA § 29-4-7. Where, as here, the court does appoint a guardian ad litem to represent the minor, the minor is in effect made a party to the action and has standing through the guardian ad litem to appeal. Cf. *In the Interest of G. K. J.*, 187 Ga. App. 443 (1) (370 SE2d 490) (1988); OCGA § 15-11-85 (a). Moreover, when it has been shown that there are parties besides the plaintiffs and defendant who have a direct interest in the result of an appeal, we have authority to allow such other parties to appear by counsel on equal terms with the parties directly before the court. OCGA § 5-6-1. No one has a greater interest than the child who is the subject of the custody dispute and whose future is at stake. The child's interest is paramount. OCGA § 19-9-3.

3. The parents contend that the trial court erred in considering the amendment to the custody petition requesting grandparent visitation rights, as the amendment was procedurally improper.

OCGA § 19-7-3 (b) gives any grandparent the right to file an original action for visitation rights to a minor child or to obtain visitation rights by intervening in an existing proceeding concerning custody, divorce, termination of parental rights, visitation rights, or adoption by a blood relative or stepparent. See *Anderson v. Sanford*, 198 Ga. App. 410 (401 SE2d 604) (1991). OCGA § 19-7-3 (c) authorizes the court to grant any grandparent reasonable visitation rights upon proof of special circumstances which make such visitation rights necessary to the best interests of the child, but it also provides that an original action requesting visitation rights shall not be filed by any grandparent more than once during any two-year period and shall not be filed during any year in which another custody action has been filed concerning the child.

The parents maintain that the amendment to the petition is not authorized by OCGA § 19-7-3 (b), because it is not an original action or an intervention in an existing proceeding. They thus argue that where a grandparent has filed an original action seeking custody, she cannot amend her petition to seek visitation rights. This argument is

without merit. OCGA § 19-7-3 (b) refers to an "original action," not an "original pleading." Since this action was originated by the grandmother who has sought visitation rights through an amendment to her petition, it is an "original action for visitation rights" within the meaning of OCGA § 19-7-3 (b). Contrary to the parents' argument, it has not been filed during any year in which "another custody action" has been filed concerning the child. The petition for custody and amendment for visitation rights were filed by the grandmother in the same action.

4. The parents contend that the court abused its discretion in granting extended visitation rights to the grandmother, relying on *Ryback v. Cobb County Dept. of Family &c. Svcs.*, 163 Ga. App. 165 (293 SE2d 563) (1982). We find no abuse of discretion under the facts of record. Moreover, the parents have not provided us with a transcript of the trial and we must assume the findings of the trial court were authorized by the evidence presented. *MacDonald v. MacDonald*, 156 Ga. App. 565, 569 (1c) (275 SE2d 142) (1980).

5. The motion of grandmother and guardian ad litem for frivolous appeal penalties pursuant to Court of Appeals Rule 26 (b) is denied.

*Judgment reversed in Case No. A94A0566. Judgment affirmed in Case No. A94A0567. Andrews and Blackburn, JJ., concur. Johnson, J., disqualified.*

DECIDED JUNE 28, 1994.

*Bernard Knight, Randy J. Comins*, for appellants.
*Susan G. Bueter, Patricia B. Ball, Julian A. Mack*, for appellees.