A94A1769. DAVIS et al. v. COPELAN.
A94A1770. RUSSELL v. DAVIS et al.
A94A1771. DAVIS v. RUSSELL.
A94A1772. SOUTH FULTON MEDICAL CENTER, INC.
v. DAVIS et al.
A94A1773. RUSSELL v. DAVIS.
(452 SE2d 194)

McMURRAY, Presiding Judge.

Cathy Davis, Isiah Floyd, Jr., Calvin Getter, Jessie Gibson, Gail Huitt, Ernestine Laidler, Juanita Levell, Mary White, and Frances Worthy (plaintiffs) brought an action against South Fulton Medical Center, Inc. ("South Fulton" or "the hospital"), the hospital's chief executive officer, Neil Copelan, its personnel director, Pat Cheek, Robbie Russell, individually and in his capacity as a law enforcement officer for the City of East Point, Georgia, and other defendants who are not named herein in view of the fact the cases on appeal relate

only to the parties specifically named herein, alleging that Cheek and Copelan disparaged their good names and reputations by accusing them of crimes they did not commit and that these hospital officials, along with Officer Robbie Russell, subjected them to fascist-type interrogation before terminating their employment with the hospital. In pertinent part, plaintiffs assert claims against South Fulton, Cheek and Copelan for libel, slander, intentional infliction of emotional distress and employment discrimination pursuant to Title VII of the Civil Rights Act of 1964. Plaintiffs assert state law claims against Russell for intentional infliction of emotional distress and claims pursuant to 42 USC § 1983 for deprivation of rights under the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution. Defendants denied the material allegations of plaintiffs' complaint (as amended) and filed motions for summary judgment against hotly disputed evidence underlying plaintiffs' claims. However, after giving plaintiffs the benefit of all reasonable inferences and construing the evidence in a light which most favorably supports their claims, *Miller v. Rieser*, 213 Ga. App. 683, 684 (446 SE2d 233), we observe the following:

During the summer of 1991, Pat Cheek contacted the Tri-Cities Narcotics Task Force to investigate reports of missing inventory and suspicious employee activity at the hospital. East Point Police Officer Robbie Russell responded and his resulting undercover investigation led hospital officials to discharge 29 employees, including plaintiffs.[1] However, before their discharges, each employee was separately called to South Fulton's personnel department for unexpected (by each plaintiff) but well-rehearsed interviews with Personnel Director Pat Cheek and Undercover Police Officer Robbie Russell. These meetings were not simply pre-termination hearings as required by the hospital's employee handbook; the interviews were set up to glean information to support criminal charges South Fulton and Officer Russell were developing against two other hospital employees. The interrogations followed the same essential format, Cheek and Russell employing veils of force, authority and intimidation to draw information from plaintiffs against other hospital employees or to induce plaintiffs to make statements against their own interest.

At about 12:30 in the afternoon on October 22, 1991, Cathy Davis, an employee at South Fulton for over 14 years, was unexpectedly summoned to appear before Pat Cheek in the hospital's human resources office. Davis responded immediately and, upon entering the

---

[1] During this undercover assignment, Officer Russell was under scrutiny by the East Point Police Department for allegedly reducing felony drug charges against a criminal suspect with whom he had become intimately acquainted. Officer Russell subsequently resigned his position as an East Point Police Officer.

personnel director's office, she observed Pat Cheek sitting behind her desk and Officer Russell standing by a chair in front of the door. Russell flashed a badge and handed Davis a card, but did not verbally identify himself. Russell then turned and instantly accused Davis of stealing, falsely informing her that she had been videotaped receiving stolen property. Russell asked Davis if she was acquainted with a pharmacy technician who had given her a dose of prescription medication. However, before Davis could respond, Russell bellowed out, demanding to know if Davis was calling the pharmacy technician a liar. Russell informed Davis that the pharmacy technician claimed to have given Davis two bags of drugs (penicillin) from the hospital pharmacy. Davis denied this allegation and informed Russell that, over the years, hospital pharmacists or pharmacy technicians had occasionally given her single doses of nonprescription medication and (apparently on one occasion) a single dose of medication for which she had a legitimate doctor's prescription. Davis explained that this practice was an apparent perquisite of employment, openly approved by hospital management. Although the practice of giving single doses of medication to hospital employees was (later) affirmed as a legitimate benefit of employment by the hospital's vice president in charge of human resources (Jack H. Taylor, Jr.), Russell informed Davis that she was stealing hospital property and that her employment was terminated. Russell then advised Davis that she could either sign a statement admitting her alleged transgressions or go to jail. Under protest, Davis complied with this demand. Davis prepared and executed a statement indicating that she had received, in accordance with hospital policy, single doses of nonprescription medication and medication (for which she had a prescription) from the hospital pharmacy. The 45-minute interrogation then terminated and Davis was escorted off the hospital's property. Davis later applied for unemployment benefits, but she was initially refused because the Georgia Department of Labor separation notice the hospital filed provided that Davis was terminated for "theft by receiving stolen property of [the] hospital." However, when Davis appealed this decision, the hospital failed to appear or otherwise put up any evidence supporting its allegation and Davis was awarded unemployment compensation. She was never charged with any criminal offense.

At about 3:00 in the afternoon on October 24, 1991, Isiah Floyd, Jr., then employed as an operating room technician at South Fulton for two years, was advised by his supervisor that Pat Cheek wanted to see him in her office. Floyd responded immediately and, upon entry into the personnel director's office, he observed Cheek sitting behind her desk and Officer Russell sitting right inside the door. Floyd also noticed an unholstered gun on the seat of a chair in Cheek's office. Russell instantly ordered Floyd to sit down. Floyd complied. Russell

then asked if Floyd knew who he was, opened his coat and flashed a plastic badge and advised Floyd that he was suspected of dealing illegal drugs on hospital property. Russell threatened that Floyd "would be carried to jail" and that Russell "should lock [him] up right now." When Floyd tried to respond, Russell told him to "shut up and don't say nothing, if [he] did, he was going to take [Floyd's a___] to jail." Floyd denied the accusations, but Cheek did not respond. Russell went on making threatening gestures, advising Floyd that jail was an alternative and that he would come to Floyd's home (apparently) to arrest him. Russell then flipped through a folder of certain undisclosed documents and informed Floyd that he had "10 years of back charges [against Floyd]." (Floyd testified in his deposition that he has a wife and children; that he did not sell drugs on hospital property and that he has never been convicted of a crime.) After 45 minutes of the interrogation, the interview terminated and so did Floyd's employment. The hospital later filed a separation notice with the Georgia Department of Labor providing that Floyd was terminated because he "was observed buying/selling drugs on hospital property." However, Floyd was never charged for any criminal wrongdoing relating to Russell's accusations.

At about 4:30 p.m. on October 24, 1991, Calvin Getter, a two-year employee in the hospital's environmental services department, was informed by his supervisor that Pat Cheek wanted him in her office. Upon arriving at the personnel office, he discovered Pat Cheek's door closed. Getter knocked on the door and Officer Russell told him to come in and take a seat. Russell was sitting at the door with his back against the wall and Cheek was sitting at her desk. Russell immediately asked if Getter knew who he was and Getter replied, "you're a cop." Russell then called Getter a "smart [a___] and said he would ride [Getter] out of there with handcuffs on [and] take [Getter] to jail." Russell then accused Getter of buying and selling drugs on hospital property and told Getter that the hospital had him on camera doing so. Getter asked to see Russell's proof, but Cheek informed him he was being fired for buying and selling drugs on hospital premises regardless of proof. The 20-minute interrogation then ended and Getter was escorted off the premises by personnel from the hospital's security force. The hospital filed a separation notice with the Georgia Department of Labor providing that Getter was terminated because he was "observed buying drugs on hospital property." Getter was never charged for any of the crimes leveled by the hospital and Russell.

On October 22, 1991, Jessie Gibson, employed at South Fulton in the environmental services department for over a year and a half, was unexpectedly summoned to Pat Cheek's office. When he arrived, Pat Cheek's office door was closed. Gibson knocked, gained entry and ob-

served Pat Cheek sitting behind her desk and Officer Russell standing in front of Cheek's desk. As Gibson entered, Russell moved around and sat in front of the closed office door. Russell then told Gibson that he had Gibson's criminal record and a videotape showing him "stealing Vaseline and Tylenol from the [hospital] pharmacy." Russell demanded that either Gibson give him a statement of what he took from the hospital pharmacy or else he would "handcuff [Gibson's] butt and take [him] to jail." Gibson complied, preparing and executing a statement that he "received Tynol [(apparently Tylenol)] and Vaseline from . . ." the hospital's pharmacy. Cheek then advised Gibson that his employment was over and instructed him to clear out his belongings and report back to her office. Gibson complied and, when he returned to Cheek's office, Russell told him to get off the property and not to come back. Russell also told Gibson that if he told anybody about what had transpired "he would see to [Gibson] going to jail." However, after conclusion of the 30-minute interrogation and before Gibson left, Cheek told Gibson to report back on October 23, 1991, to pick up his paycheck. When Gibson returned for his pay, Cheek advised him that she would give Gibson his pay a day early if he would write out a statement about other people going to the hospital pharmacy. Gibson got paid and the hospital filed a separation notice with the Georgia Department of Labor providing that Gibson was terminated "due to theft by receiving stolen property of [the] hospital." However, Gibson later received unemployment benefits, but only after the hospital failed to appear in response to Gibson's appeal from the denial of his initial application for benefits.

At about 11:00 in the morning on October 23, 1991, Gail Huitt, a seven-year veteran nurse at South Fulton, received a beep from nursing administration informing her that Pat Cheek wanted to see her in personnel. She immediately responded and found Officer Russell standing behind Cheek's office door. Pat Cheek was seated behind her desk. Russell closed the door, pulled out a badge, identified himself as a law enforcement officer and informed Huitt that she had been called in "because [she] had broken the law." Huitt asked Russell what she had done and Russell informed her that "they" had her on "video camera" receiving "pills" from the pharmacy. When Huitt asked what kind of pills, Russell accused her of stealing "aspirin" and "Tylenol." Huitt denied obtaining these nonprescription items, explaining that she does not use them. Russell then became angry and again accused Huitt of stealing. Russell shouted that he "wanted to take [her] to jail, put [her] under arrest, and [that] he was not going to show [her] his evidence until after [she] had been locked up in jail." Huitt then tried to talk directly with Cheek, asking what was going on. Cheek told Huitt her employment was terminated for stealing. Russell then advised Huitt "not to talk to Pat Cheek, to talk to

him, and not to ask [Cheek] any questions." Russell then jumped out of his seat, stood over Huitt and hollered that he would take Huitt to jail if she did not admit her alleged transgressions. Huitt again tried to address Pat Cheek. Russell reacted by telling Huitt not to be "trying to outsmart [him] and outtalk [him]." Russell also told Huitt that "tonight [her] 14 year old daughter is going to have to come and get [her] out of jail because I'm going to arrest you, I've got warrants right here." Russell then displayed undisclosed contents of a folder, accused Huitt of lying and repeatedly threatened to take Huitt to jail. At this point, Cheek dictated a written statement for Huitt's signature, providing that Huitt received "Bufferin and Seldane from the hospital pharmacy." Huitt denied that she had received "Seldane" and Cheek advised Huitt that she would be allowed to leave the hospital after execution of the statement. Russell then "jumped up . . ." and Huitt signed the statement. The 45-minute interrogation ended and so did Huitt's job, but not without unemployment compensation benefits. Huitt received unemployment compensation after the hospital failed to substantiate the hospital's reported reason for Huitt's termination, i.e., "theft by receiving stolen property of the hospital." Huitt was never charged for any offense relating to theft of hospital property.

On October 24, 1991, Ernestine Laidler, a 13-year veteran employee at the hospital, was called to Pat Cheek's office. When Laidler arrived at the meeting, Cheek was sitting behind her desk and Officer Russell was sitting behind the door. Russell immediately began questioning Laidler about her knowledge of recent employee terminations. Laidler replied that she did not know much. Russell then accused Laidler of stealing from the hospital pharmacy and stated that she had been videotaped at the pharmacy. Cheek advised Laidler that it was "theft." Russell advised Laidler that if she did not write a statement "he could handcuff her and haul her off to [the] East Point jail." At that point, Laidler attempted to leave the meeting, but Pat Cheek told her to sit down. Laidler complied and executed a statement that provides, "[I] only got a telyow [(apparently Tylenol)] and a xlax [(apparently Ex-Lax)] at the pharmacy." Laidler's employment was then terminated and the 45-minute interrogation ended. Laidler was never charged with any offense relating to the accusations leveled against her by the hospital and Russell. She later obtained unemployment compensation, but only after the hospital failed to substantiate the basis of its claim that Huitt was terminated for cause, i.e., "due to theft by receiving stolen property of [the] hospital."

Juanita Levell worked in the Environmental Services Department at South Fulton for over 11 years before her termination on October 22, 1991. At approximately 2:10 that afternoon, Levell was notified by her supervisor that she was wanted in personnel. Levell

complied, went to the personnel director's office and waited. After about five minutes, Pat Cheek entered the office with Officer Russell. Cheek sat behind her desk and Russell closed the door and sat in front of Cheek's desk. Russell immediately asked Levell about her knowledge of recent employee terminations. Russell then advised Levell that her "friend, Brenda [was] in jail." Levell disagreed with this allegation, informing Russell that "Brenda" was an employment acquaintance, not a friend, and she did not know anything about an arrest. Russell then questioned Levell about stealing from the hospital pharmacy and informed Levell that he "could drag [her] under the jail for this." Levell defended herself, claiming that pharmacists had occasionally given her single doses of "Ex-Lax, Mylanta, Tylenol, Actifed [and] some Correctol." Cheek then stated that these acts constituted theft and Russell told Levell that if she did not sign a statement saying what she had received from the pharmacy he would take her to jail. Russell dictated a statement and Levell signed it. Russell then threatened Levell that the statement could be used against her "if [she went] any further with this or [said] anything about it to anyone else." Russell advised Levell, "[o]f course you're fired because you was stealing." Cheek took Levell's employment identification badge and instructed her to sit outside in the outer area until Levell could be escorted off the premises. Levell complied, but before leaving Russell told Levell that if she talked to anyone she would not receive unemployment benefits. Levell was never charged with any offense and she obtained her unemployment benefits, but only after the hospital failed to substantiate the basis of its claim that Levell was terminated for cause, i.e., "due to theft by receiving stolen property of [the] hospital."

Mary White was employed by South Fulton in 1975. It was her first job; she worked as a nursing assistant, dietary aide and secretary. On the morning of October 24, 1991, White received a call from Pat Cheek to report to her office at 10:30 that morning. When White arrived, Personnel Director Cheek was sitting behind her desk and Officer Russell was standing behind the door. Russell told White to sit down, he had "some questions." White complied and Russell sat between White and the closed door. He then quickly flashed his badge and informed White that he was an undercover narcotics officer. Russell asked White if she had heard about recent employee terminations and White responded affirmatively, stating that "it was scary because [she] didn't know the reasons why." Russell then informed White that cameras in the hospital pharmacy had shown her face frequently. White explained that a hospital pharmacist gave her a dose of "Tylenol for a headache" about a week before October 24, 1991, and that she retrieved a dose of "Tylenol" from the hospital pharmacy for her supervisor about two weeks before the termination meeting. Russell

informed White that she was stealing. White then explained that the hospital pharmacist had verified her requests for the "Tylenol" and that she "would not have jeopardized [her] job for two Tylenol." Russell replied, "stupid people do stupid things." Russell told White that he would like to "handcuff [her] and take [her] to jail" and later advised White that "she needed to write a statement about the pharmacy matter." White complied and Cheek instructed her to turn in her identification badge and parking card. White was then instructed to remain seated until security could escort her off the premises. About 35 or 40 minutes after the interrogation began, White was without a job. However, she was never charged with any criminal offense and she obtained unemployment benefits, but only after the hospital failed to substantiate the basis of its claim that White was terminated for cause, i.e., "theft by receiving stolen property of [the] hospital."

Frances Worthy began working as a nurse's assistant at the hospital in December 1978. At approximately 1:00 in the afternoon on October 22, 1991, Worthy received a call from her supervisor that she was wanted in personnel. Worthy did not respond immediately as she was occupied with work duties. However, about 15 to 20 minutes later, Worthy received another call instructing her to go to personnel "right away because Pat [Cheek] is waiting . . . in her office." Worthy went directly to the personnel office and found Cheek sitting at her desk and Officer Russell was standing behind the door. Russell pushed the door, flashed his badge and asked, "are you Frances Worthy?" Worthy responded affirmatively and Russell advised her that there had been a great deal of theft of hospital property, "people taking a lot of drugs out of the hospital." Worthy advised Russell that she was not aware of any such activities. Russell then informed Worthy that she was on "film" and that other hospital employees had stated that she had taken drugs from the hospital pharmacy. Russell advised Worthy that if she cooperated with him things would "go lighter" on her. Worthy informed Russell that a hospital pharmacist gave her a blood pressure pill (medicine prescribed by Worthy's cardiologist) about a year before the termination interview. Russell advised Worthy that if she did not tell the truth "she was going to be news." He then threatened that Worthy's husband was going to have to pay a lot of money to bail her out of jail if she did not cooperate and that he was going to "call the East Point police [and have her] arrested. . . ." Worthy denied any wrongdoing and Russell asked if Worthy was calling everyone "damned liars." Russell then picked up his unholstered pistol (which he had displayed on an empty chair), "put it on his leg and sat in the chair" and asked, "are you ready to tell the truth now, Ms. Worthy, about these lies you've been telling?" Worthy indicated that she had been out on leave and that she did not

know what was going on at the hospital. Russell called her a "smart [a___]" and Pat Cheek said nothing. Russell then stood up, laid his gun on the chair and informed Worthy that her statement would be turned over to the media if she told anyone (apparently) about his interrogation. Cheek advised Worthy that her career at the hospital was over because she had taken drugs from the hospital pharmacy. Cheek then instructed Worthy to prepare a statement regarding receipt of blood pressure medication from the hospital pharmacy. Worthy complied and Russell instructed her to sign the statement. Russell then advised Pat Cheek to seize Worthy's time cards and identification badge. Cheek complied and Worthy was gone. The hospital reported to the Georgia Department of Labor that Worthy was discharged for "theft by receiving stolen property of [the] hospital."

In December 1991, Chief Executive Officer Neil Copelan published in the hospital's internal newsletter, "STETHOSCOOP," an editorial titled, "From My Viewpoint." This editorial provides in pertinent part as follows: "During the past few weeks all of us have learned of very disturbing activities within our hospital. Some of our fellow employees were involved in these activities and their employment ended abruptly. Law enforcement personnel who conducted an investigation for us identified and arrested criminals and suspected criminals. . . . Many of you have been stunned by these events and the behavior that led up to them. Others have acknowledged that wrong doing has occurred for a long time and have offered reasons why it continued. The hospital staff as well as physicians have been abuzz about all this. Was the four-month-long undercover investigation of theft and drug infractions a negative or a positive event for [South Fulton Medical Center]? Without question, it was positive."

The trial court entered two orders resolving defendants' motions for summary judgment. The first order provides (in pertinent part) for denial of summary judgment as to Russell "acting in his individual capacity as to *all claims*[, the grant of summary judgment to the City of East Point and the grant of summary judgment] with respect to *all claims* as to Defendant [Russell], acting in his individual official capacity." The second order provides (in pertinent part) for denial of summary judgment as to plaintiffs' claims against South Fulton for intentional infliction of emotional distress and violation of Title VII of the Civil Rights Act of 1964. The order also provides for denial of summary judgment as to plaintiffs' claims against Copelan and Cheek for intentional infliction of emotional distress and plaintiffs' claims against Cheek for slander and libel. The trial court granted summary judgment in favor of South Fulton, Copelan and Cheek as to plaintiffs' 42 USC § 1983 claims and granted summary judgment in favor of South Fulton and Copelan on plaintiffs' claims for libel and slander. Plaintiffs filed direct appeals in Case Nos. A94A1769 and

A94A1771. In Case Nos. A94A1772, Copelan, Cheek and South Fulton cross-appeal. Defendant Russell filed a direct appeal in Case No. A94A1770 and a cross-appeal in Case No. A94A1773 from the partial denial of his motion for summary judgment. We consolidate these appeals and consider them in one opinion. *Held*:

### Case No. A94A1769

1. In their first enumeration, plaintiffs contend the trial court erred in granting summary judgment for Neil Copelan on their claims of libel, arguing that genuine issues of material fact remain concerning whether readers of the "STETHOSCOOP" article could ascertain whether Copelan was referring to plaintiffs in the editorial.

"To sustain an action for libel, ' "(t)he (allegedly) defamatory words must refer to some ascertained or ascertainable person, and that person must be the plaintiff. If the words used really contain no reflection on any particular individual, no averment or innuendo can make them defamatory. An innuendo can not make the person certain which was uncertain before." Where the words of the alleged libelous matter are so vague and uncertain that they could not have been intended to refer to any particular person, or the published words are incapable of any other construction other than (that) they are not defamatory of the plaintiff, the petition is subject to (dismissal). (Cits.) "A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it. So the whole item . . . should be read and construed together, and its meaning and signification thus determined. When thus read, if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not. If upon the other hand, it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read." ' *Ledger-Enquirer Co. v. Brown*, 214 Ga. 422, 423-424 (105 SE2d 229) (1958)." *Fiske v. Stockton*, 171 Ga. App. 601, 602 (1) (320 SE2d 590).

In the case sub judice, the evidence shows that plaintiffs are nine of twenty-nine hospital employees who were discharged en masse shortly before publication of the "STETHOSCOOP" article; that "STETHOSCOOP" is a publication circulated amongst a relatively small group of people (i.e., primarily hospital employees) and that other hospital employees were acquainted with plaintiffs and the circumstances of their discharges. Under these circumstances, we find that genuine issues of material fact remain as to whether the average

reader of the "STETHOSCOOP" editorial would identify plaintiffs as members of the 29 employees Copelan characterized as "criminals or suspected criminals." Accordingly, the trial court erred in granting summary judgment in favor of Neil Copelan as to plaintiffs' claim of libel.

2. Next, plaintiffs contend the trial court erred in granting summary judgment in favor of South Fulton as to the above claims of libel. We agree.

"[T]he usual rules of respondeat superior (the principal is liable for the torts of his employee committed while acting within the scope of his employment) are applicable in libel cases. See Division 2 of *Behre v. National Cash Register Co.*, [100 Ga. 213, 214 (2) (27 SE 986)]." *Garren v. Southland Corp.*, 237 Ga. 484, 485 (228 SE2d 870). In the case sub judice, Neil Copelan appears to have been acting within the scope of his employment as president and chief executive officer of the hospital at the time he published his editorial in "STETHOSCOOP." Consequently, in light of our holding in Division 1 of this opinion, genuine issues of material fact remain as to South Fulton's liability for libel. The trial court erred in so granting South Fulton's motion for summary judgment.

3. Plaintiffs also contend summary judgment was improperly granted as to their slander claims against Neil Copelan. We do not agree.

The basis of plaintiffs' slander claims against Neil Copelan appears to be testimony that Copelan spoke with the media about the alleged criminal activity at the hospital. This testimony "is not evidence of a slanderous statement. There was no testimony as to the *actual words* employed by [Copelan] and the witness[es] may have been 'led to believe' an untruth about [plaintiffs] without [Copelan] ever having uttered any defamatory words. Innuendo may be employed to demonstrate that *ambiguous words* are slanderous, but it does not obviate the necessity for proof of the words that were actually spoken." *Safety-Kleen Corp. v. Smith*, 203 Ga. App. 514 (3), 515 (417 SE2d 171). "If there is no evidence of any specific words or statements uttered by [Copelan to the media], there can be no finding that he published a slander. See *Tomblin v. S. S. Kresge Co.*, 132 Ga. App. 212, 216 (5) (207 SE2d 693) (1974)." *ITT Rayonier v. McLaney*, 204 Ga. App. 762, 764 (2), 765 (420 SE2d 610). Consequently, the trial court did not err in granting summary judgment in favor of Neil Copelan as to plaintiffs' claims of slander.[2]

---

[2] Although plaintiffs contend in their brief that video recordings of news broadcasts (wherein Copelan was interviewed) speak for themselves, no such videotapes appear in the records on appeal.

*Case No. A94A1772*

4. Pat Cheek contends the trial court erred in denying her motion for summary judgment as to the defamatory statements she uttered against plaintiffs in the presence of Officer Russell, arguing that publication of this information is privileged because it was in the course of an intra-corporate investigation of an employee's job performance. We do not agree.

First, Russell was not an agent or employee of the hospital so as to afford Cheek the shield of "intra-corporate" privilege. He was a law enforcement officer, purportedly serving the separate and distinct interests of the public. Compare *ITT Rayonier v. McLaney*, 204 Ga. App. 762, 764 (2), 765, supra. Second, the "intra-corporate" investigation defense is a conditional privilege which may not be sustained on summary judgment if there is conflicting evidence as to whether there was malice by reckless disregard and exaggeration of the truth. *Anderson v. Housing Auth. of Atlanta*, 171 Ga. App. 841, 842 (1), 843 (321 SE2d 378). In this regard, we find no definitive evidence that plaintiffs Floyd and Getter were actually involved in illegal drug transactions on hospital property. Further, an officer of South Fulton (Jack H. Taylor, Jr.) gave deposition testimony that obtaining single doses of medication from the hospital pharmacy was a long-standing employee benefit at South Fulton. Under these circumstances, we find genuine issues of material fact remain as to Pat Cheek's liability for accusing plaintiffs of criminal activity in the presence of Officer Russell. *Anderson v. Housing Auth. of Atlanta*, 171 Ga. App. 841, 842 (1), 843, supra. Consequently, the trial court did not err in denying Pat Cheek's motion for summary judgment in this regard.

5. Pat Cheek next contends the trial court erred in denying her motion for summary judgment as to plaintiffs' defamation claims relating to publication of the reasons for plaintiffs' discharge to the Georgia Department of Labor. We agree. These communications are absolutely privileged pursuant to OCGA § 34-8-122 (a) (formerly OCGA § 34-8-11 and Code Ann. § 54-642.1). *Cox v. Brazo*, 165 Ga. App. 888, 890 (4) (303 SE2d 71), aff'd 251 Ga. 491 (307 SE2d 474). The trial court erred in denying summary judgment as to these aspects of plaintiffs' defamation claims.

6. Pat Cheek, Neil Copelan and South Fulton contend the trial court erred in denying summary judgment as to plaintiffs' claims of intentional infliction of emotional distress. We do not agree.

"Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law. *Gordon v. Frost*, [193 Ga. App. 517, 518 (1), 521 (388 SE2d 362)]. If the evidence shows that reasonable persons might find the presence of extreme and outrageous con-

duct and resultingly severe emotional distress, the jury then must find the facts and make its own determination. Id." *Yarbray v. Southern Bell Tel. &c. Co.*, 261 Ga. 703, 706 (2) (409 SE2d 835). In the case sub judice, there is evidence that Pat Cheek conspired with Officer Russell to separately and unexpectedly call plaintiffs to her office for the intimidating, abusive and well-planned termination interviews. Further, the evidence shows that Pat Cheek allowed an armed law enforcement officer to attend the meetings; that she permitted the officer to dominate the meetings and that she acquiesced in the officer's intimidating, overbearing and abusive conduct. There is also evidence that Neil Copelan was aware of these systematic and purposefully abusive interrogations and that he did nothing to stop them. On the contrary, in his editorial Copelan stated that the four-month undercover investigation was "[w]ithout question . . . positive." Finally, it is undisputed that Pat Cheek orchestrated the pre-termination interrogations of plaintiffs while acting within the scope of her employment as the hospital's personnel director. Under these circumstances, we find the evidence sufficient to authorize a finding that the pre-termination interrogations were so extreme and outrageous to authorize a finding of intentional infliction of emotional distress. Accordingly, the trial court did not err in denying summary judgment to Pat Cheek, Neil Copelan and South Fulton on plaintiffs' claims of intentional infliction of emotional distress. See *Yarbray v. Southern Bell Tel. &c. Co.*, 261 Ga. 703, 706 (2), supra.

7. South Fulton contends the trial court erred in denying its motion for summary judgment with regard to plaintiffs' claims of discrimination pursuant to 42 USC § 1981. It is unnecessary to address this enumeration because plaintiffs state in their opposing brief that they have voluntarily dismissed their claims pursuant to 42 USC § 1981. *American Cyanamid Co. v. Carter*, 164 Ga. App. 538, 539 (1) (298 SE2d 276). Compare *Dept. of Human Resources v. Chambers*, 211 Ga. App. 763, 764 (1) (441 SE2d 77).

8. South Fulton enumerates as error the trial court's denial of summary judgment on plaintiffs' claims pursuant to Title VII of the Civil Rights Act of 1964 (42 USC § 2000e et seq.), arguing that plaintiffs have failed to present evidence that white employees committed the same or similar misconduct as plaintiffs, yet were retained. This contention is without merit.

" 'With respect to cases involving discharge for violation of work rules, the plaintiff [alleging disparate treatment] must establish that he was a member of (the) protected group[, i.e., black,] and then make a showing of some evidence to demonstrate either that he did not violate the rule or that, if he did, [white] employees who engaged in similar acts were not punished similarly. (Cits.)' *Capps v. Southeast Pkg. Corp.*, 612 FSupp. 419, 421 (N.D. Ga. 1984)." *Kut-Kwick*

*Corp. v. Johnson*, 189 Ga. App. 500, 501 (1), 503 (376 SE2d 399); see *Jones v. Gerwens*, 874 F2d 1534, 1540 (11th Cir. 1989). In the case sub judice, all of the plaintiffs are black, seven of the plaintiffs deposed that they never received anything but single doses of medication from the hospital pharmacy, a practice expressly allowed under hospital policy, and those plaintiffs accused of dealing in illegal drugs on hospital property (Getter and Floyd) denied engaging in such activity. This evidence and evidence that at least one white employee engaged in conduct relating to receipt of medication from the hospital pharmacy without being discharged is sufficient to authorize the trial court's finding that genuine issues of material fact remain as to plaintiffs' claims of race discrimination. However, plaintiffs' damages are limited to those authorized by the Civil Rights Act of 1964 and not to damages specified in § 101 of the Civil Rights Act of 1991 as their claims allegedly arose before this enactment of the Civil Rights Act of 1991. *Landgraf v. USI Film Prods.*, 511 U. S. ___ (114 SC 1483, 128 LE2d 229).

The trial court did not err in denying South Fulton's motion for summary judgment with regard to plaintiffs' claims pursuant to Title VII of the Civil Rights Act of 1964.

### Case No. A94A1771

9. Plaintiffs contend the trial court erred in granting summary judgment as to their state law claim (intentional infliction of emotional distress) against defendant Russell in his capacity as a law enforcement officer for the City of East Point, arguing that genuine issues of material fact remain as to Russell's oppressive, corrupt and malicious behavior so as to remove the defense of official immunity.[3]

"The immunity defense invoked in support of summary judgment by [Russell is] official immunity, which protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice or corruption. *Cooper v. Swofford*, 258 Ga. 143 (368 SE2d 518) (1988); *Hennessy v. Webb*, 245 Ga. 329 (264 SE2d 878) (1980); *Truelove v. Wilson*, 159 Ga. App. 906, 907 (285 SE2d 556) (1981)." *Guthrie v. Irons*, 211 Ga. App. 502 (1) (439 SE2d 732). In the case sub

---

[3] Plaintiffs never specifically asserted claims of false arrest and false imprisonment against Russell in their complaint and amended complaint, but they argued that genuine issues of material fact remain as to these claims in opposition to defendant Russell's motion for summary judgment. However, there is no indication that the issues of false arrest and false imprisonment were resolved in that part of the trial court's order addressing claims against Russell in his official capacity. "Thus, such a position was not part of the summary judgment of the trial court and cannot be considered on appeal. [Cits.]" *Lewis v. Rickenbaker*, 174 Ga. App. 371, 372 (2) (330 SE2d 140).

judice, the trial court granted summary judgment "with respect to *all claims* as to Defendant [Russell], acting in his individual official capacity." However, the trial court simultaneously denied summary judgment as to Russell "acting in his individual capacity as to *all claims. . . .*" Consequently, there is no way of determining whether the trial court reached the issue of Russell's personal liability, vel non, based on official immunity. Accordingly, the issue of Russell's defense of official immunity is remanded to the trial court for clarification. In this regard, see *Gilbert v. Richardson*, 264 Ga. 744 (452 SE2d 476); and *Partain v. Maddox*, 131 Ga. App. 778, 781 (1) (206 SE2d 618).

## Case No. A94A1773

10. Defendant Russell cross-appeals from that portion of the trial court's order denying summary judgment as to his liability "acting in his individual capacity as to *all claims. . . .*" We do not reach this issue as the trial court entered conflicting rulings as to Russell's personal liability. See Division 9 of this opinion. Accordingly, this appeal is remanded to the trial court for clarification.

## Case No. A94A1770

11. The grant of a motion for summary judgment is directly appealable, but the denial of a motion for summary judgment must be appealed in accordance with the interlocutory appeal provisions of OCGA § 5-6-34 (b). OCGA § 9-11-56 (h). This court denied Russell's application for interlocutory review of the trial court's partial denial of his motion for summary judgment. However, Russell also filed this direct appeal (A94A1770) from the same order and he raised identical enumerations of error in his cross-appeal in Case No. A94A1773. "For an order that is not directly appealable to be added to a direct appeal under [OCGA] § 5-6-34 (d), the order sought to be added must be an order that 'may affect the proceedings below.' [OCGA] § 5-6-34 (d)." *Martin v. Williams*, 263 Ga. 707, 709 (3), fn. 3 (438 SE2d 353). Accordingly, we have no jurisdiction over Case No. A94A1770 and the same is hereby dismissed. *Morman v. Bd. of Regents &c. of Ga.*, 198 Ga. App. 544 (402 SE2d 320).

*Judgments affirmed in part and reversed in part in Case Nos. A94A1769 and A94A1772. Case remanded in Case Nos. A94A1771 and A94A1773. Appeal dismissed in Case No. A94A1770. Pope, C. J., and Smith, J., concur in the judgment only.*

DECIDED DECEMBER 5, 1994 —
RECONSIDERATION DENIED DECEMBER 19, 1994 — 

*Sullivan, Hall, Booth & Smith, Michael A. Pannier, Kirwan, Goger, Chesin & Parks, A. Lee Parks, Jr.,* for Copelan and South Fulton Medical Center.

*Novy, Jaymes & Vaughan, Eugene Novy, Deborah M. Vaughan,* for Davis.

*Drew, Eckl & Farnham, Theodore Freeman, Philip W. Savrin,* for Russell.