A92A1045. COX ENTERPRISES, INC. et al. v. BAKIN.
(426 SE2d 651)

COOPER, Judge.

We granted appellants' application for interlocutory appeal to determine whether the trial court erred in denying appellants' motion for summary judgment in appellee's suit for libel. This case involves 31 articles published in The Atlanta Journal & Constitution ("the newspapers") over a two-year period after the death of Gregory Dozier at Clayton General Hospital.

Appellee, Dr. Grant Bakin, was the physician on duty in the emergency room when Dozier was brought to the hospital for serious injuries sustained in a fight, the most severe of which was a deep gash in his right arm from which Dozier lost a great deal of blood prior to the arrival of an ambulance. Dozier was treated by hospital personnel in the emergency room, including Dr. Joe Choi and appellee, for several hours and was eventually moved to intensive care under Dr. Choi's care. Appellee's notes indicate that while Dozier was in the emergency room "there was absolutely no active bleeding from Mr. Dozier's visible wound sites." Shortly thereafter, Dr. R. Kashlan, a surgeon, examined Dozier in consultation with Dr. Choi and discovered, after removing Dozier's bandages, a fairly deep laceration pouring sanguineous material. Dozier was immediately taken to the operating room for exploration of the wound and died during surgery. After Dozier was pronounced dead, Dr. Kashlan sutured the wound before his body was taken to the morgue. An autopsy revealed that hypovolemia (blood loss) due to a stab wound in the upper right arm was the cause of death.

The complaint alleged that appellants, the writers of the articles, editors and publishers of the newspapers, falsely, maliciously and recklessly reported that appellee failed to provide proper treatment to Dozier and allowed him to bleed to death in the emergency room at the hospital. The newspapers first reported Dozier's death on February 22, 1989 in an article entitled, "Case of Man Who Bled to Death in Clayton Hospital Probed." The article stated that the medical examiner subpoenaed the "emergency medical records of a man who bled to death in Clayton General Hospital at least seven hours after he was taken there with stab wounds in his right arm"; that the records were subpoenaed because of inconsistencies in the time of death and in statements made by hospital officials; that Dozier died on the operating table as doctors tried to repair a severed artery; that the autopsy showed that Dozier had two severe cuts in his right arm and a cut on his face; and that the cuts in his arm had been sutured. The article also reported that according to the police, Dozier was stabbed at about 1:15 a.m. and was taken to Clayton General at 2:25 a.m.; that at 7:00 a.m., Dozier was wheeled into the operating room; and that he died at 9:17, although a hospital spokesperson reported Dozier died at 10:20 a.m. An investigator from the medical examiner's office was quoted as saying that Dozier bled to death as a result of the arm injury but that much could not be said until the medical records were supplied. Dozier's sister was quoted as follows: "He apparently bled to death. . . . That's was puzzles me. I couldn't believe it. In a hospital? They're supposed to be the ones that stop the bleeding. If it was needed, they would do a blood transfusion, that's what I would think." (Indention and punctuation omitted.) The hospital spokesperson reportedly said that Dozier died on the operating table but that he did not die from the stab wounds and was treated minute by minute with appropriate treatment. She did not explain why doctors operated four-and-a-half hours after Dozier arrived, nor would she confirm that he received stitches before surgery. Major Dwayne Hobbs of the Forest Park police was quoted as saying that detectives working on the case told him that doctors stitched Dozier up and later emergency room personnel " 'noticed that he was getting worse and found out he was bleeding again' "; that there was blood on a stretcher and Dozier was taken back into surgery where he died; and that appellee treated Dozier in the emergency room and said that Dozier suffered "a 'severe loss of blood, but that if he dies it would be . . . from complication of alcohol and drugs in his blood system.' " The article concluded with a quote from Dozier's mother, "Sometime I break down. . . . I'm just trying to hold out. I don't know what happened. That's what we're trying to find out."

On February 23, 1989, a second article was published entitled, "State Agencies Want Details Of Death at Clayton Hospital," with

the subtitle, "Cut Artery Reportedly Not Treated for Hours." This article reported that the Georgia Department of Human Resources ("DHR") and the Composite State Board of Medical Examiners ("CSBME") sought the details of Dozier's treatment in the emergency room. The article restated that Dozier died on an operating table; that initial autopsy findings concluded that he bled to death because of a severed artery in his right arm; and that Forest Park police said that Dozier's injuries were stitched before the severed artery was discovered. Then the article stated that Dozier was treated by appellee for cuts in his right arm and hypothermia; that appellee is a New York native and a graduate of the Autonomous University of Guadalajara, Mexico; that appellee was one of nine emergency room physicians who formed the Atlanta Emergency Group, a private partnership with an exclusive contract with the hospital to provide its emergency room services; that appellee was licensed to practice in Georgia in 1983, six months after receiving his "doctor's credentials"; and that although appellee listed emergency medicine on his license renewal in 1987, prior to 1987 he listed that he was a psychiatrist. According to the article, the hospital's administrator said that he was conducting his own investigation into the death; that Dozier was suffering from hypothermia and suspected intoxication which may have contributed to the delay in treatment of the artery; and that the spokesperson incorrectly reported the time of death because a doctor had written the wrong time on Dozier's record. However, he refused to account for the four-and-a-half hour span before the surgery, to state the point at which the doctors determined Dozier needed surgery or to give the name of the surgeon who operated on Dozier. A DHR official is reported to have said her agency would investigate whether state rules and regulations were violated in the emergency room in a broad context, not focusing solely on the Dozier case. The CSBME director reportedly said they would investigate whether the medical treatment fell below standards. The article indicates that if either the hospital or the physician were found to have given inadequate care, both state agencies could file civil charges. None of the remaining 29 articles specifically name appellee or refer to him. The articles only mention the Dozier incident and focus on state and federal investigations into the hospital's practices which eventually expanded beyond the emergency room, other deaths in the hospital, corrective action taken by the hospital, the threat to the hospital's federal funding because of alleged deficiencies, criticism of the hospital's accreditation, the hospital's efforts to improve its image, sanctions against three unnamed physicians, a private group's evaluation of 100 state hospitals, a Clayton County Commission public hearing and grand jury probe into the administration of the hospital and "negligent" physicians, criticism of the hospital administrator, the

resignation of the administrator and chairman of the hospital authority, the consent agreement between the hospital and the state, the removal of the hospital from the critical list, the expansion of the emergency room and the hiring of a new administrator. Three of the articles involve the firing of the Atlanta Emergency Group and its subsequent suit against the hospital; however, none makes any specific reference to appellee.

1. In their first two enumerations of error appellants contend that the majority of the articles are not of and concerning appellee and that the two articles that do refer to appellee are true and not conclusive as to whether Dozier's death was caused by deficient treatment and therefore cannot be defamatory. "To sustain an action for libel ' "(t)he (allegedly) defamatory words must refer to some ascertained or ascertainable person, and that person must be the plaintiff. If the words used really contain no reflection on any particular individual, no averment or innuendo can make them defamatory. An innuendo can not make the person certain which was uncertain before." Where the words of the alleged libelous matter are so vague and uncertain that they could not have been intended to refer to any particular person, or the published words are incapable of any other construction other than (that) they are not defamatory of the plaintiff, the petition is subject to (dismissal). (Cits.) "A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it. So the whole item . . . should be read and construed together, and its meaning and signification thus determined. When thus read, if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not. If upon the other hand, it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read." ' [Cit.]" *Fiske v. Stockton*, 171 Ga. App. 601, 602 (1) (320 SE2d 590) (1984).

Based on a review of the 31 articles cited by appellee, we conclude at the outset that the 29 articles which do not refer to him specifically or by innuendo are not defamatory. Appellee contends that although the articles do not specifically name him, because he was identified as Dozier's emergency room physician in the first two articles, later references to Dozier's death by implication refer to him. However, those articles make limited reference to the Dozier incident for historical reference, and certainly contain no reflection on any particular individual with regard to Dozier's death. See *Armscorp of America v. Daugherty*, 191 Ga. App. 19, 20 (380 SE2d 729) (1989);

*Fiske*, supra. In our view, the average reader would not draw the conclusion that appellee carelessly let Dozier bleed to death in the emergency room or that his treatment was otherwise deficient. *Macon Telegraph Pub. Co. v. Elliott*, 165 Ga. App. 719 (1) (302 SE2d 692) (1983).

Moreover, the February 22 and 23, 1989 articles in their entirety also cannot be reasonably construed to be defamatory. First of all, the articles clearly state that Dozier died on the operating table during *surgery*, not in the emergency room, and the newspapers reported an unexplained four-and-one-half hour delay in the *surgical* repair of the severed artery. Secondly, what is written specifically about appellee is essentially true. Appellee complains that the Atlanta Emergency Group is a professional corporation and not a private partnership; however, this error is not significant. Appellee also complains of certain omissions which create a false impression of his treatment of Dozier, specifically, the newspapers' failure to report that Dozier lost a large amount of blood before arriving at the hospital, the fact that appellants chose to focus on particular aspects of his background and the fact that the CSBME determined he did not violate any provisions of the Medical Practice Act in his treatment of Dozier. Appellee points to reporter's notes which indicate that one of the reporters was aware of the CSBME ruling and contends that the newspapers' failure to report the ruling is evidence of the newspapers' recklessness or a deliberate attempt to create a negative impression of his treatment. " ' "(A)n omission of information from a statement admittedly published will not support an action for libel. (Cit.)" (Cit.)' [Cit.]" *Yandle v. Mitchell Motors*, 199 Ga. App. 211 (404 SE2d 313) (1991). While the newspapers might have had a moral obligation to do a follow-up story on the CSBME's findings, there apparently was no legal obligation for them to do so.

In addition, appellee complains that the February 22 article falsely reported that Forest Park police sources claimed doctors stitched Dozier up and later that emergency room personnel noticed that the bleeding was getting worse because Major Hobbs, who was quoted in the article, testified later in a deposition that he did not recall providing such information. The February 23 article also indicated that Forest Park police said that Dozier's injuries were stitched before the severed artery was discovered. This statement is clearly contradicted by Dr. Kashlan's report which indicates that the arm wound was not sutured prior to the surgery. However, neither article states that appellee sutured the arm, that the suturing was negligently performed or that the suturing resulted in Dozier's death. The articles also indicated that other doctors were involved in his treatment. We agree with appellants that the thrust of the articles is that days following Dozier's death it was unclear what care rendered by

818

Clayton General possibly contributed to his death. Both articles reported that various entities were looking into the circumstances surrounding Dozier's death and Clayton General's role, not that appellee's treatment was deficient. Moreover, notwithstanding appellee's contentions, "in considering whether a writing is defamatory as a matter of law, we look not at the evidence of what the extrinsic circumstances were at the time indicated in the writing, but at what construction would be placed upon it by the average reader. [Cits.]" *Macon Telegraph*, supra at 721. In our view, " '[t]he words of the [articles] contain no hurtful innuendo regarding appellant's character or behavior and a reader's subjective decision to impute such innuendo to the [articles] is not actionable as a defamation. (Cit.)' [Cit.] The article[s] ' "[lack] the element of personal disgrace necessary for defamation." (Cit.)' [Cit.]" *Mead v. True Citizen*, 203 Ga. App. 361, 362 (417 SE2d 16) (1992). Therefore, because the 31 articles are not defamatory, the trial court erred in denying appellants' motion for summary judgment.

2. Based on the foregoing we need not consider appellants' remaining enumerations of error.

*Judgment reversed. Sognier, C. J., and McMurray, P. J., concur.*

DECIDED DECEMBER 4, 1992 —
RECONSIDERATION DENIED DECEMBER 17, 1992

*Dow, Lohnes & Albertson, Peter C. Canfield, Jean B. Blumenfeld*, for appellants.

*Remler, Koski & Near, Robert C. Koski, Bruce Berger, Oliver, Duckworth, Sparger & Winkle, David P. Winkle*, for appellee.