A95A2745. SOUTHERN COMPANY et al. v. HAMBURG.
(470 SE2d 467)

McMURRAY, Presiding Judge.

This defamation action arose after The Southern Company ("Southern") issued two press releases regarding the suspension and discharge of Jeffrey R. Hamburg as President and Chief Executive

Officer of a Southern subsidiary known as Southern Electrical International, Inc. ("SEI"). Southern, SEI and Paul DeNicola, Southern's executive vice president and member of SEI's board of directors (defendants), filed this appeal, challenging the sufficiency of the evidence with regard to awards on Hamburg's claims for defamation, breach of his employment contract, and attorney fees and expenses of litigation under OCGA § 13-6-11. We affirm in part, reverse in part, and remand for consideration of the probative evidence supporting Hamburg's claim for attorney fees and expenses of litigation.

On October 3, 1991, Kimberly Dozier, a reporter with a leading utility industry publication known as *The Energy Daily*, received a telephone call from a man who said that SEI's president and chief executive officer "is being fired." The tipster "didn't identify himself and told [the reporter] to look into it." Dozier hung up and immediately telephoned Gale Klappa, Southern's vice president in charge of public relations. Klappa responded by dictating the following press release: "An internal review of Southern Electric International's business practices is being conducted to determine whether the company's ethical standards have been met. SEI President Jeff Hamburg is cooperating with this review, and pending the outcome of the evaluation, J. R. Harris, who recently served as vice president of our investor relations office in New York, has assumed Hamburg's administrative responsibilities at SEI. More detailed information will be made available at the conclusion of this review — which we expect to be completed by early next week."[1]

Three days later, during a Sunday evening meeting on October 6, 1991, SEI's board of directors voted to discharge Hamburg and, at 10:00 the next morning, Gale Klappa telephoned Kimberly Dozier and told her, "we've got the rest of the story[,] or the results of our investigation are done [and we] have a statement, would you like it?" Klappa then read a prepared statement and affirmed that SEI's in-

---

[1] Dozier authored an article conveying the content of this press release in the October 4, 1991, edition of *The Energy Daily*. The article is captioned, "Internal Review Initiated at SEI," and states as follows: "Atlanta-based Southern Electric International, a subsidiary of The Southern Co., is under internal review 'to determine whether the company's ethical standards have been met,' Southern Co. spokesman Gale Klappa told *The Energy Daily* late Thursday. SEI President Jeffrey Hamburg is on administrative leave and is cooperating with the review, Klappa said. J. R. Harris, who recently served as vice president of Southern Co.'s investor relations office in New York, has assumed Hamburg's administrative responsibilities at SEI, pending the outcome of the evaluation, Klappa added. Klappa was not at liberty to release details on who reported SEI's questionable business practices, nor whether an outside agency was or would be involved with the review, which is expected to be completed by early next week, he said. SEI is subject to Securities and Exchange Commission review as a subsidiary of its registered holding company and parent. SEI is The Southern Co.'s 'diversified subsidiary,' which builds and operates power plants for other utilities in the U.S. and abroad, and provides technical expertise to other utilities, Klappa said. Southern has never broken out SEI's separate earnings, he added. Hamburg could not be reached for comment."

vestigation involved "the Pego Plant, [a] 600 megawatt oil plant [in Portugal]." A written memorandum from Klappa was later forwarded to Dozier and made available to other news publishers across the country. The memorandum is captioned, "News Advisory From Southern Electrical International — a subsidiary of The Southern Company." It states as follows: "Over the past several days, the board of directors of Southern Electric International has been conducting an internal review of the business practices of the organization. SEI — a subsidiary of The Southern Company — designs, builds, owns, and operates cogeneration and independent power production facilities. SEI also provides a broad range of technical services to industrial companies and utilities in domestic and international markets. The internal review focused primarily on a project under development in Portugal. Acting on the results of the investigation, the SEI board has dismissed the president and chief executive of the company. Jeff Hamburg has served in this position since July of 1989. All information obtained from the review is being provided to the appropriate government agencies. 'We're committed to taking decisive action when our business standards are not met,' said Paul DeNicola, a member of the SEI board and executive vice president of The Southern Company. On an interim basis J. R. Harris, who recently served as vice president in The Southern Company's investor relations office in New York, has been named president of SEI. 'We will begin a search for a new president immediately,' DeNicola said, 'and I'm confident that the quality of service and expertise that SEI employees have provided to their clients throughout the world will be maintained today and in the years ahead.' "

Kimberly Dozier authored an article in the October 8, 1991, edition of *The Energy Daily* captioned, "SEI's Hamburg Fired For Unethical Acts." The article states: "Southern Electric International fired its President and Chief Executive Officer Jeff Hamburg on Monday for unethical business practices in bidding for a coal-fired power plant in Portugal, the SEI board said. Hamburg has served in these positions since July 1989. Hamburg was dismissed after the SEI board conducted an internal review of the company late last week, the board said. The resulting information is being given to the appropriate government agencies, added Southern Co. Spokesman Gale Klappa. SEI is the Southern Co. affiliate that designs, builds, owns and operates cogeneration and independent power production facilities. 'We're committed to taking decisive action when our business standards are not met,' said Paul DeNicola, a member of the SEI board and executive vice president of the Southern Co. J. R. Harris, who recently served as vice president in Southern's investor relations office in New York, has been named SEI's interim president. The Portugal project that led to the investigation is a two-unit, 600 mega-

watt coal-fired facility north of Lisbon. The Portuguese national power agency, Electricidade de Portugal, is selling the partially constructed plant as part of its plan to privatize its power industry. The buyer would complete one unit of the plant by 1993, and the second by 1995, and would sell power back to the power agency. SEI is the major player in one of four groups that submitted bids for the project in June. The Portuguese government is expected to make a decision on the bid by or before the end of the next year, Klappa said."

Vice President Klappa telephoned Kimberly Dozier a day or so after the appearance of her October 8, 1991, article and "said that in their statement they never directly said what [Dozier] reported, [i.e.,] that Mr. Hamburg was fired for unethical business practices, to which [Kimberly Dozier] replied, but your first release said that the investigation was into the company's ethical standards, your second release said acting on the results of the investigation the board has dismissed the president, and then two paragraphs down you have a company spokesman, Paul DeNicola, . . . saying, we're committed to taking decisive actions when our business standards are not met. [Dozier then asked Klappa,] What do you want? Would you like us to publish a correction?" Klappa responded, "no, that won't be necessary, I just wanted you to keep in mind for the next time you read a story on this, that we never said that."

After his discharge, Jeffrey R. Hamburg brought an action against defendants, seeking damages for defamation, intentional infliction of emotional distress and breach of his employment contract. Hamburg also sought attorney fees and expenses of litigation pursuant to OCGA § 13-6-11, alleging that defendants acted in bad faith, have been stubbornly litigious, or have caused him unnecessary trouble and expense. Defendants asserted truth as a defense to Hamburg's defamation claims and alleged (in the pre-trial order) that they were justified in discharging Hamburg "for cause, gross negligence and/or willful misconduct by virtue of his blatant insubordination, his efforts to funnel money to SEI's foreign partners under highly suspicious circumstances and other misconduct." Hamburg's response was that defendants maliciously and publicly trumped-up charges against him to screen their long-time knowledge of alleged improprieties by SEI's Portuguese partner, information that may have required SEI's withdrawal from bidding on the prospectively profitable "Pego Project." Hamburg claimed (in the pre-trial order) that defendants set him up as a "scapegoat."

After almost three years of litigation, the case was tried before a jury upon a tangle of conflicting evidence. The jury returned a special verdict, awarding Hamburg $181,000 on his breach of contract claim, $624 in medical expenses and no general damages on his intentional infliction of emotional distress claim, and $543,000 in lost earnings,

$2,000,000 in general damages and no punitive damages on his defamation claim. The jury also found Hamburg entitled to attorney fees and expenses of litigation. The trial court conducted a hearing and received evidence on this finding and later entered judgment, awarding Hamburg an aggregate amount of $2,009,689 for attorney fees and expenses of litigation. This appeal is from the denial of defendants' joint motion for judgment notwithstanding the verdicts ("j.n.o.v.") as to Hamburg's defamation, breach of contract and attorney fees and expenses of litigation claims. *Held*:

1. Defendants challenge the denial of their motion for j.n.o.v. as to Hamburg's defamation claim, contending the press releases Gale Klappa gave the media were not defamatory, as a matter of law, because neither statement targets a particular individual with regard to the reported ethics investigation. Defendants also assert that the second press release accurately reports that Hamburg was discharged after an investigation of SEI's "business practices" and that both of the carefully worded statements cannot be enlarged, via innuendo, to convey a derogatory meaning. In support of these assertions, defendants cite *Zielinski v. Clorox Co.*, 215 Ga. App. 97, 99 (2) (450 SE2d 222); *Hylton v. American Assn. &c.*, 214 Ga. App. 635, 638 (3) (448 SE2d 741); *Cox Enterprises v. Bakin*, 206 Ga. App. 813, 816 (1) (426 SE2d 651), and *Armscorp of America v. Daugherty*, 191 Ga. App. 19, 20 (380 SE2d 729).

" 'To sustain an action for libel, " 'the (allegedly) defamatory words must refer to some ascertained or ascertainable person, and that person must be the plaintiff. If the words used really contain no reflection on any particular individual, no averment or innuendo can make them defamatory. An innuendo can not make the person certain which was uncertain before.' Where the words of the alleged libelous matter are so vague and uncertain that they could not have been intended to refer to any particular person, or the published words are incapable of any other construction other than (that) they are not defamatory of the plaintiff, the petition is subject to (dismissal). (Cits.) 'A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it. So the whole item . . . should be read and construed together, and its meaning and signification thus determined. When thus read, if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not. If upon the other hand, it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read.' " *Ledger-*

*Enquirer Co. v. Brown*, 214 Ga. 422, 423-424 (105 SE2d 229) (1958).'
*Fiske v. Stockton*, 171 Ga. App. 601, 602 (1) (320 SE2d 590)." *Davis v. Copelan*, 215 Ga. App. 754, 763 (1) (452 SE2d 194).

In the case sub judice, we cannot say that the two press releases issued by Gale Klappa on October 3 and 7, 1991, are not defamatory as a matter of law. The first press release states that SEI's internal investigation is aimed at determining compliance with SEI's ethical standards and that Hamburg has been placed on administrative leave during the investigation. The second press release states that SEI's internal investigation resulted in Hamburg's discharge and then quotes defendant "Paul DeNicola, [as] saying, we're committed to taking decisive actions when our business standards are not met." Under these circumstances and in light of evidence that Hamburg was not considered for an executive position at another major corporation because of dissemination of the two press releases at issue, we cannot say that defendants' statements about Hamburg and the internal investigation at SEI (when taken together) do not authorize the jury's finding that defendants were referring to Jeffrey R. Hamburg and that the press releases did impugn his character and reputation in the business community. Indeed, Gale Klappa's rejection of Kimberly Dozier's offer to retract her report that SEI fired Hamburg because of unethical acts reinforces the jury's finding that defendants intended to publicly censure Hamburg by conveying that he was fired for unethical "business practices."

2. Defendants further challenge the denial of their motion for j.n.o.v., arguing that Hamburg failed to present evidence refuting their defense that the press releases were true.

The problem with defendants' contention is that the damaging inference conveyed by the press releases (i.e., that Hamburg unethically pursued a foreign venture on behalf of SEI) is a conclusion which can only be refuted by attacking the factual basis of the accusation. To this extent, Hamburg presented ample evidence that he had no firm reason to believe that his actions in managing the "Pego Project" were improper or were otherwise subject to criticism. Hamburg also offered extensive evidence that SEI's internal investigation was tainted by clandestine communications, unfounded rumors and careless or deliberate conclusions regarding his knowledge of and participation in a bribery scheme that was allegedly contrived by SEI's Portuguese partner. Hamburg testified that defendants never told him about any such impropriety, which SEI and Southern undisputedly knew about over six months before Hamburg's suspension, and this testimony is corroborated by proof that defendants never formally or informally charged Hamburg with any impropriety before his suspension on October 3, 1991. Hamburg testified that the information defendants withheld would have controlled certain promises he

extended to SEI's Portuguese business partner, promises which were the primary focus of SEI's internal investigation.

"While the truth of the charge made may always be proved in justification, Code Ann. § 105-708 [now OCGA § 51-5-6], nevertheless, truthfulness is a question of fact for the jury. *Lester v. Trust Co. of Ga.*, 144 Ga. App. 526, 528 (241 SE2d 633) (1978)." *Hub Motor Co. v. Zurawski*, 157 Ga. App. 850, 852 (3) (278 SE2d 689). The conflicting evidence in the case sub judice regarding the truth or falsity of facts underlying defendants' charge that Hamburg acted unethically in exercising his authority as SEI's President and Chief Executive Officer was sufficient to create a jury question. " 'If there is any evidence to support the verdict, this court, on appeal, will not disturb it.' *Hinson v. O'Quinn*, 159 Ga. App. 589 (284 SE2d 97). Our standard of review when presented with a challenge to the verdict on the general grounds was enunciated well in the case of *Williams v. Stankowitz*, 149 Ga. App. 865, 866 (256 SE2d 147): 'We will not weigh the evidence, and in fact are precluded from doing so. (Cits.) In the absence of legal error, an appellate court is without jurisdiction to interfere with a verdict supported by some evidence even where the verdict may be against the preponderance of the evidence. (Cit.) We will not speculate as to what evidence the jury chose to believe or disbelieve; on appeal, this court is bound to construe the evidence with every inference and presumption being in favor of upholding the jury's verdict, and after the verdict is approved by the trial judge, the evidence must be construed so as to uphold the verdict even where there are discrepancies. (Cits.)' See also *Barry v. J. C. Penney Co.*, 159 Ga. App. 587, 588-589 (284 SE2d 91)." *Jeff Goolsby Homes Corp. v. Smith*, 168 Ga. App. 218, 219 (1) (308 SE2d 564).

3. Further, it is contended by defendants that the trial court erred in denying their motion for j.n.o.v. with regard to Hamburg's defamation claim, arguing that there was no evidence to support the jury's $543,000 award for lost earnings. This enumeration is without merit. " 'Statements which tend to injure one in his or her trade, occupation, or business have been held to be libelous per se, and one need not prove special damages in such instances. *Walker v. Sheehan*, 80 Ga. App. 606, 611 (56 SE2d 628) (1949); *Dickey v. Brannon*, 118 Ga. App. 33, 35 (162 SE2d 827) (1968).' *Hub Motor Co. v. Zurawski*, 157 Ga. App. 850, 852 (3)[, supra]." *Stalvey v. Atlanta Business Chronicle,* 202 Ga. App. 597, 599 (1), 600 (414 SE2d 898).

The trial court did not err in denying defendants' motion for j.n.o.v. with regard to Hamburg's defamation claim.

4. Defendants next contend the trial court erred in denying their motion for j.n.o.v. with regard to Hamburg's claim for attorney fees and litigation expenses, arguing that there is no evidence to support the jury's finding that they acted in bad faith, were stubbornly litig-

ious, or caused Hamburg unnecessary trouble and expense. Defendants assert that Hamburg is not entitled to damages under OCGA § 13-6-11 because there was a bona fide controversy over their liability for defamation as well as for breach of Hamburg's employment contract.

" 'A plaintiff may recover for bad faith concerning the transactions and dealings out of which the cause of action arose. OCGA § 13-6-11; (cits.). A bona fide controversy within the contemplation of the code section pertains solely to the issue of stubborn litigiousness or causing the plaintiff unnecessary trouble and expense. Despite the existence of a bona fide controversy as to liability, a jury may find that defendant "acted in the most atrocious bad faith in his dealing with the plaintiff." (Cits.)' *Fidelity Nat. Bank v. Kneller*, 194 Ga. App. 55, 63 (3) (390 SE2d 55) (1989)." *Walther v. Multicraft Constr. Co.*, 205 Ga. App. 815, 816 (2) (423 SE2d 725). And if there is any evidence to support a jury's finding of bad faith concerning the transactions and dealings out of which the cause of action arose, the award will not be set aside on appeal as the question of liability under OCGA § 13-6-11 is a matter for the jury. *Spring Lake Property Owners Assn. v. Peacock*, 260 Ga. 80, 81 (390 SE2d 31); *R. T. Patterson Funeral Home v. Head*, 215 Ga. App. 578, 585 (5) (451 SE2d 812).

Although the evidence supporting Hamburg's bad faith claims in the case sub judice appears to be mostly circumstantial, we cannot say that absolutely no evidence was presented in support of his claims that SEI acted in bad faith in discharging him without severance pay, in violation of Hamburg's employment contract, and that defendants acted in bad faith in publishing statements that diminished Hamburg's character and reputation in the business community. Hamburg's testimony indicates that, before his discharge from SEI, he enjoyed a reputation for good character and honesty, explaining how he grew from humble roots, worked through the ranks and ultimately achieved recognition and respect as a strong corporate leader. Hamburg's testimony also reveals that his abilities and good name caused others (including Southern and SEI) to seek him for top leadership positions. Also, that before his discharge from SEI, he received favorable reviews and rewards from SEI for doing his job well. Hamburg asserted, however, that improprieties allegedly precipitated by SEI's Portuguese partner and made known to defendants in March 1991, caused his fortunes to change. In this vein, Hamburg testified that defendants neither advised him about alleged improprieties that arose at a meeting defendants' agents had with SEI's Portuguese partner in March 1991, nor approached him about their suspicions that he may be an accomplice to an alleged bribery scheme that was then contrived by SEI's Portuguese partner. Further, Hamburg showed that defendants never allowed him to answer to such charges

during a clandestine investigation defendants initiated before his suspension on October 3, 1991. More persuasively, however, is Hamburg's evidence that certain agents of SEI and Southern had interests (conflicts) which may have motivated baseless charges concerning illegal activities by Hamburg and SEI's Portuguese partner. This evidence (although hotly disputed) is sufficient to authorize the jury's finding that SEI acted in bad faith in discharging Hamburg without severance pay and that defendants acted in bad faith in issuing negative statements about Hamburg's character. Moreover, the fact that defendants decided to issue statements to the media indicating that Hamburg is an unethical person, would authorize a finding that defendants recklessly (with wanton disregard for the consequences) published the damaging press releases. To say otherwise, ignores that the defamatory comments at issue are not subject to objective proof, such as "he did this" or "she did that." But are statements which, when read together, infer a pejorative characterization which, intrinsically, is subject to varying opinions and perspectives.

The trial court did not err in denying defendants' motion for j.n.o.v. with regard to Hamburg's claim for attorney fees and expenses of litigation.

5. Defendants contend there was insufficient evidence to support the trial court's award of $2,009,689 for attorney fees and expenses of litigation. We agree.

" ' "An award of attorney fees is unauthorized if [Hamburg] failed to prove the actual costs of [his attorneys] and the reasonableness of those costs. (Cit.)" *Fiat Auto U.S.A. v. Hollums*, 185 Ga. App. 113, 116 (5) (363 SE2d 312) (1987).' *Southern Cellular Telecom v. Banks*, 209 Ga. App. 401, 402 (433 SE2d 606)." *Mitcham v. Blalock*, 214 Ga. App. 29, 31 (2) (447 SE2d 83). In the case sub judice, Hamburg offered the testimony of his lead attorney who identified billing and expense summaries, which abstract (according to the witness) relevant billings and expenses generated on behalf of Hamburg. While these summaries record the efforts and expenses of Hamburg's lead attorney, most of the reported billings and expenses were generated by persons who did not testify at the hearing. Consequently, the billing summaries "constitute nothing more than 'hearsay, and hearsay, even when admitted into evidence without objection, lacks probative value to establish any fact. *Howell Mill/Collier Assoc. v. Pennypacker's*, 194 Ga. App. 169, 171 (2) (390 SE2d 257).' *Mitcham v. Blalock*, 214 Ga. App. 29, 31 (2), 32 . . . supra." *Citadel Corp. v. All-South Subcontractors*, 217 Ga. App. 736, 737 (1), 738 (458 SE2d 711). Accordingly, to the extent that nonprobative evidence was considered in awarding attorney fees and expenses of litigation, the trial court's award cannot be sustained. The case "must be reversed in part 'and the case remanded for an evidentiary hearing to establish the amount

of attorney fees attributable to [probative evidence offered at the hearing]. See *Southern Cellular Telecom v. Banks*, 209 Ga. App. 401, 402, supra.' *Mitcham v. Blalock*, 214 Ga. App. 29, 31 (2), 33[, supra]." *R. T. Patterson Funeral Home v. Head*, 215 Ga. App. 578, 585 (5), 586, supra. See *City of College Park v. Pichon*, 217 Ga. App. 53, 55 (4) (456 SE2d 686).

6. The trial court did not err in denying SEI's motion for j.n.o.v. with regard to Hamburg's claim for breach of his employment contract. The employment contract provided for the payment of a specific sum if Hamburg was discharged for any reason other than conduct constituting a crime, gross negligence or wilful misconduct. Hamburg presented evidence refuting SEI's claim that he was discharged for any of these reasons. See *Jeff Goolsby Homes Corp. v. Smith*, 168 Ga. App. 218, 219 (1), supra. The jury was therefore authorized in finding that Hamburg was entitled to severance benefits under his employment contract.

*Judgment affirmed in part, reversed in part, and remanded with directions. Andrews and Blackburn, JJ., concur.*

DECIDED MARCH 15, 1996 —
RECONSIDERATIONS DENIED MARCH 27, 1996 — ▮▮▮▮▮▮▮

*Jones, Day, Reavis & Pogue, W. Lyman Dillon, David M. Monde*, for appellants.
*Arnall, Golden & Gregory, Kevin B. Getzendanner, Scott E. Taylor*, for appellee.