A02A1957. REECE et al. v. CHESTATEE STATE BANK.
(579 SE2d 11)

MIKELL, Judge.

Chestatee State Bank (the "Bank") filed the underlying action against Terri and Woody Reece, alleging that the defendants defaulted on two promissory notes. Mr. and Mrs. Reece filed a counterclaim for intentional infliction of emotional distress. The trial court granted summary judgment to the Bank on both the breach of contract action and the counterclaim. Mr. and Mrs. Reece appeal, arguing that genuine issues of material fact remain. We disagree and affirm.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the non-moving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). . . . Our review of an appeal from summary judgment is de novo.

(Citations omitted.) *Vasquez v. Smith,* 259 Ga. App. 79 (576 SE2d 59) (2003).

We have attempted to decipher the underlying facts in this case, although the parties provided very few accurate record citations that meet the requirements of Court of Appeals Rule 27 (a) (1) and (c) (3) (i) and (iii). Viewed in favor of the Reeces as the nonmoving parties, the record shows that two promissory notes were executed in favor of the Bank. The first note, loan no. 400027000 ("Note 1"), was signed by both Woody and Terri Reece on August 12, 1998. Note 1 had a principal loan amount of $74,206.64 and a maturity date of February 10, 2002. It provided for 42 payments in the amount of $2,087.67, due on the tenth day of each month, beginning on September 10, 1998. Note 1 was secured by a deed to 58.4133 acres of real property owned

by Kenneth Stephens,[1] which was also dated August 12, 1998. Woody and Terri Reece personally guaranteed Note 1.

A second promissory note was executed in favor of the Bank on December 1, 1998, by Terri Reece and Kenneth Stephens. Loan no. 400051900 ("Note 2") was in the principal amount of $57,764.53, and had a maturity date of December 1, 2003. Note 2, like Note 1, was secured by the August 12, 1998, security deed to Stephens's real property. This note provided for 60 payments of $1,195.65, due on January 1, 1999, and the first day of each month thereafter. There is no personal guaranty in the record referring to Note 2.

On December 9, 1998, Stephens's wife, Carolyn, executed a security deed to the same piece of real property in favor of the Bank. This deed appeared to have been executed in connection with Note 1, as it referenced an indebtedness of $74,206.64, due and payable on February 10, 2002. Carolyn Stephens signed a modification agreement on December 10, 1998, which referred to the December 9 security deed and Note 1. The agreement increased the total principal owed to $131,971.17,[2] due on December 1, 2003. Both Kenneth and Carolyn Stephens executed a third security deed to the same property on October 19, 1999. The third deed referred to the original principal amount and maturity date of Note 1, rather than to the modified amount contained in the December 10, 1998, agreement. The reasons behind the execution of the second and third security deeds and the modification agreement are not clear from the record or the briefs.

On February 6, 2001, Rex McClinton, a lawyer representing the Bank, sent Woody and Terri Reece a letter notifying them that Note 1 was past due and therefore in default, and that the remaining principal balance of the debt, plus accrued interest, was immediately due and payable. According to the letter, the current balance on the note was $65,628.18. The record does not reveal what steps, if any, were taken by the Reeces in response to the default letter. The Bank filed suit against the Reeces, but not against Kenneth or Carolyn Stephens, on March 6, 2001.

On May 14, 2001, after the action against the Reeces had commenced, two additional modification agreements were filed. Significantly, the Reeces were not parties to either agreement. First, Kenneth and Carolyn Stephens executed a modification agreement which referred to the October 19, 1999, deed securing Note 1. The agreement provided that the Bank modified the original indebtedness such that the total principal amount owed became $50,127.50, "repre-

---

[1] According to the appellants' brief, Stephens is Terri Reece's father.
[2] This amount represents the sum of the total indebtedness contained in the two notes.

sented by a note having a final payment date of May 14, 2002." On that same day, Kenneth Stephens executed a modification agreement referring to the August 12, 1998, deed and Note 1, which provided that the total indebtedness was $131,971.17, due on December 1, 2003.

In connection with the pending litigation against the Reeces, Jean Walden, an assistant vice president of the Bank, provided an "affidavit in verification of debt." Walden swore that as of September 21, 2001, both notes were in default; that the balance owed on Note 1 was $28,002.96; that $36,752.18 was owed on Note 2; and that the total principal balance due on both notes was $64,755.14. Walden's affidavit does not mention the three modification agreements.

Woody Reece submitted an affidavit in which he admits executing Note 1 but states that he cannot confirm the balance owed. Terri Reece provided a similar affidavit, in which she admits executing both notes but says that "I shouldn't have to pay off a note alone that is executed by both my father and me." Both affidavits state that Terri's sister, Marsha Hansard, was employed as a vice president of the Bank and that there was some animosity between Terri Reece and Hansard. Additionally, both Terri and Woody mention that Kenneth Stephens was under indictment by the federal government for drug trafficking, and they allude to the fact that they were not on good terms with Stephens. Significantly, neither Woody nor Terri disputes the fact that the notes are in default.

1. The Reeces contend that the trial court erred in concluding that they were both liable to the Bank under Note 1 and that Terri was liable on Note 2. They argue that the modification agreements executed by Kenneth and Carolyn Stephens somehow extinguished their obligations under the notes. We disagree.

It is undisputed that Woody and Terri Reece executed Note 1, as well as the guaranty of that note, and that Terri Reece executed Note 2. Furthermore, the Reeces have presented no evidence to rebut the Bank's showing that they are currently in default. "Once the record evidence, as here, shows a promissory note has been duly executed and is in default, a prima facie right to judgment is established and the burden shifts to the debtor to establish an affirmative defense." (Citation omitted.) *Miller v. Calhoun/Johnson Co.*, 230 Ga. App. 648, 649-650 (3) (b) (497 SE2d 397) (1998). Because the Reeces failed to establish a valid defense, the trial court properly granted summary judgment to the Bank on the notes.

First, the personal guaranty signed by both Woody and Terri Reece unconditionally obligated them for payment of Note 1. In fact, the guaranty expressly provides that "the Undersigned hereby absolutely and unconditionally guarantees to Lender the full and prompt payment when due . . . of the debts, liabilities and obligations" aris-

ing out of Note 1, "and any extensions, renewals, or replacements thereof." The guaranty also states that "no act or thing, except full payment and discharge of all indebtedness, shall in any way exonerate the Undersigned or modify, reduce, limit, or release the liability of the Undersigned hereunder" and that the guaranty "shall continue to be in force and be binding upon the Undersigned, whether or not all Indebtedness is paid in full, until this guaranty is revoked by written notice actually received by the Lender." "The unconditional guaranty agreement at issue here is unambiguous, explicit, and unconditional as to its material terms." *Ramirez v. Golden*, 223 Ga. App. 610, 611 (478 SE2d 430) (1996). Accordingly, the trial court did not err in enforcing the Reeces' obligation under Note 1.

Mr. and Mrs. Reece argue that the modification agreements signed by the Stephenses somehow discharged or altered their obligations under the notes. However, there is no basis for this argument, as the modification agreements simply reflect the total indebtedness secured by the Stephenses' property. The appellants' reliance on OCGA § 11-3-117 is misplaced. That Code section provides, in pertinent part:

> [T]he obligation of a party to an instrument to pay the instrument may be modified, supplemented, or nullified by a separate agreement of the obligor and a person entitled to enforce the instrument. . . . To the extent an obligation is modified, supplemented, or nullified by an agreement under this Code section, the agreement is a defense to the obligation.

The appellants' only argument regarding the applicability of OCGA § 11-3-117 is that "[t]his section would appear to apply to the appellants." They fail to explain how their obligation was discharged by a modification agreement to which they were not parties.

Furthermore, even assuming, arguendo, that the Reeces were accommodation parties[3] to the notes at issue, the modification agreements did not release their obligation. OCGA § 11-3-605 (c) provides that the obligation of an accommodation party may be discharged as the result of an agreement to extend the due date of the instrument at issue "to the extent the . . . accommodation party proves that the extension caused loss to the . . . accommodation party with respect

---

[3] "An accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it." (Citation and punctuation omitted.) *Bank South v. Jones*, 185 Ga. App. 125, 126 (1) (364 SE2d 281) (1987). The Reeces allege, without factual support, that they were mere accommodation parties who presumably signed the notes for the benefit of Kenneth Stephens.

to the right of recourse." Similarly, subsection (d) also requires a showing of loss in order for an accommodation party to be discharged when an obligation is modified in some way other than by extension of the due date. Subsection (e) requires a showing by the party asserting discharge that the value of the collateral has been impaired. The Reeces have failed to present any evidence of loss or impairment of the collateral used to secure the notes. Accordingly, the argument that their obligation was discharged by the modification agreements fails. To the extent that the Reeces argue that the extension of the maturity dates of the notes contained in the modification agreements affected their obligation to make monthly payments, such argument is patently without merit. See *Marable v. First Union Nat. Bank*, 232 Ga. App. 628, 629 (1) (502 SE2d 557) (1998).

Mr. and Mrs. Reece contend that the affidavit of Walden was invalid because it was dated September 24, 2001, but was notarized on September 21, 2001. Because they failed to raise the discrepancy in the court below, this issue has been waived. *Weekes v. Nationwide Gen. Ins. Co.*, 232 Ga. App. 144, 146 (1) (500 SE2d 620) (1998). We note that Walden's affidavit was filed in support of the Bank's motion for summary judgment. The Reeces did not object to the affidavit in their response to the motion, nor did they move to strike it. Instead, in a response to the Bank's subsequent motion to strike another affidavit, they state that "[i]f any affidavit should be stricken, it is the affidavit in verification of debt submitted in support of the motion for summary judgment. The affidavit is dated September 24, 2001 and the Notary Jurat is dated September 21, 2001!" Contrary to the Reeces' argument, merely mentioning an issue in the trial court without obtaining a ruling is not "raising" it so as to preserve the issue for appellate review.

> Issues presented for the first time on appeal furnish nothing for us to review, for this is a court for correction of errors of law committed by the trial court where proper exception is taken. One may not abandon an issue in the trial court and on appeal raise questions or issues neither raised nor ruled on by the trial court.

(Citation and punctuation omitted.) *Association Services v. Smith*, 249 Ga. App. 629, 632 (1) (549 SE2d 454) (2001). Because the Reeces failed to obtain a ruling from the trial court on the admissibility of the affidavit, we cannot consider the issue on appeal. Further, even if the validity of Walden's affidavit was properly before us, "it has been clearly established that where the date of the affiant's signature and the date of the notary's attestation differ, such error is an amendable defect and does not render the affidavit void ab initio." (Citation,

punctuation and footnote omitted.) *Kropp v. Roberts*, 246 Ga. App. 497, 498 (540 SE2d 680) (2000).

The Bank points out in its brief that the trial court inadvertently reversed the loan numbers in its order granting summary judgment. The order should provide that Woody and Terri Reece must pay the Bank $28,002.96 plus interest, and that Terri Reece must pay $36,752.18 plus interest. Therefore, the case is remanded with direction that the court issue a new order reflecting the correct loan numbers. Otherwise, the trial court's grant of summary judgment on the breach of contract claim is affirmed.

2. Next, the appellants assign error to the trial court's grant of summary judgment to the Bank on their counterclaim for intentional infliction of emotional distress. In their initial pleading, the Reeces based their cause of action on the fact that the Bank filed suit against them but not against Stephens. In response to the Bank's motion for summary judgment, the Reeces alleged additional wrongful conduct and submitted the affidavit of Russell Odom, their daughter's boyfriend, who described an exchange between himself and McClinton, the Bank's attorney. According to Odom, McClinton asked Odom to come to his office, where he told the young man not to associate with the Reeces. Odom further testified that McClinton stated:

> I've got a hard-on for Woody Reece so damned bad I can't stand it. I'm going to make his life miserable until he either sticks a gun in his mouth or leaves this county. . . . I'll intentionally tighten the screws on him until he cracks or leaves, and I'll give him the gun to stick in his mouth.

We agree with the trial court's conclusion that neither the fact that the Bank only sued the Reeces nor McClinton's statements to Odom support a claim of intentional infliction of emotional distress against the Bank.

> The four elements which must be proved in order to sustain a claim of intentional infliction of emotional distress are: (1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; and (4) The emotional distress must be severe. Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law. Moreover, it has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he

has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

(Citations and punctuation omitted.) *Northside Hosp. v. Ruotanen*, 246 Ga. App. 433, 435 (541 SE2d 66) (2000). Based on the evidence in the record, the court did not err in concluding as a matter of law that the Reeces' claims did not rise to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress.

First, the Reeces have presented no authority to support their contention that a plaintiff's choice to sue one particular defendant and not another provides grounds for a claim of intentional infliction of emotional distress. Common sense dictates that the strategic decision of which defendants to name in a valid lawsuit does not amount to outrageous conduct. This allegation is without merit.

Additionally, the conversation between McClinton and Odom does not support the Reeces' claim against the Bank. As a preliminary matter, they have failed to point to any evidence demonstrating that McClinton was acting on behalf of the Bank when he made the statements Odom described. Further, the alleged statements were made to Odom and not to the Reeces. It is well settled that the tortious conduct must have been directed at the plaintiff in order to be actionable under a theory of intentional infliction of emotional distress. *Lively v. McDaniel*, 240 Ga. App. 132, 134 (2) (522 SE2d 711) (1999) ("even malicious, wilful or wanton conduct will not warrant a recovery for the infliction of emotional distress if the conduct was not directed toward the plaintiff") (citation and punctuation omitted); *Munoz v. American Lawyer Media*, 236 Ga. App. 462, 465 (1) (b) (512 SE2d 347) (1999); *Willis v. United Family Life Ins.*, 226 Ga. App. 661, 666 (3) (487 SE2d 376) (1997); *Carter v. Willowrun Condo. Assn.*, 179 Ga. App. 257, 260 (5) (345 SE2d 924) (1986). Accordingly, the court properly found that McClinton's comments could not provide the basis for an intentional infliction of emotional distress claim because they were made to a third party and not to the Reeces.

*Judgment affirmed and remanded with direction. Andrews, P. J., and Phipps, J., concur.*

Decided February 6, 2003 —
Reconsideration denied March 11, 2003 — ▓▓▓▓▓▓▓

*William R. Hurst*, for appellants.
*Stewart, Melvin & Frost, Frank Armstrong III, Rex J. McClinton*, for appellee.