## A04A0024. COLLINS v. CREATIVE LOAFING SAVANNAH, INC.
### (592 SE2d 170)

ELDRIDGE, Judge.

The State Court of Fulton County granted defendant Creative Loafing Savannah, Inc.'s ("CLS") motion for summary judgment in Paulette Collins' suit seeking damages for libel, invasion of privacy — false light and appropriation, and intentional infliction of emotional distress, which suit was filed after CLS used Collins' likeness in creating a cartoon caricature published in conjunction with a cover story on telemarketing practices. Collins appeals. Finding no error in the trial court's judgment, we affirm.

"Creative Loafing" newspaper has been in circulation in Georgia for 30 years. Creative Loafing Atlanta, Inc. ("CL-Atlanta") publishes "Creative Loafing" newspaper; its corporate headquarters is in Fulton County. CLS was the Savannah "satellite" of CL-Atlanta.[1]

Plaintiff Collins was the Classified Manager for CLS. Her job involved the sale of advertisement space in issues of "Creative Loafing" newspaper, which is the sole way in which CLS generates revenue. Much of Collins' sales work was done on the telephone, and "[s]he put up good numbers." It is undisputed that Collins' work entailed establishing "a relationship with her customers, [and] it was a good one." While Collins' job often required that she initially solicit new advertising customers via telephone, it is undisputed that thereafter she maintained an ongoing relationship with her client base and that credibility was essential for the performance of her job. The record shows that Collins' "clients said she did a good job. . . . She was well received in the community."

On March 3, 2000, CLS was preparing to publish an article entitled "TELECON" and further captioned, "A Former Insider Takes You Into the Brutal World of Telemarketing — by Mark Wirtz." An exposé of telemarketing ("TM") practices, the article examined "the real-life scams of telemarketing" and was ostensibly written by one who had practiced such "scams" successfully. An overview of the "TELECON" article shows that it comprised eight columns covering two and one-half pages of the newspaper; the article began with the disclaimer,

> Before I dig into dirt of the Telemarketing world, let me state, in fairness, that there is a segment of Telemarketing which serves as an invaluable, legitimate and ethical trading and communication link in commerce, operated and staffed by skilled professionals.

---

[1] Currently, CLS is independently owned and is no longer affiliated with CL-Atlanta.

Thereafter, the first five and one-half columns discussed the sales techniques telephone sales representatives ("TSRs") utilize in order to make a sale, including adherence to a script, control, and manipulation.

The next column explained the role of TSRs in relation to any actual "scam" and asserted their innocence with regard thereto:

> The sale itself is not the scam. TSRs, after all, are just promise makers and order takers. It is whether or not the TM firm owners deliver, and what they do with the buyer's credit card number or checking account information behind the scenes that determines the honesty of it all. And the TSR has no access to that information, especially as the location of the "front office" is a mystery and typically unknown miles away from the phone room.

The next column discussed "big money scams, mostly investments in anything from precious metals, to art, to fledgling race horses," and stated that in these "high level TM scams, time is often of the essence." The writer explained that such high-stakes fraudulent schemes are "time confined" because of the knowledge that they soon will be "busted"; thus, "the race is to make as much money as possible . . . before vanishing without a trace."

The article's final one-half column again asserted the ignorance of most TSRs about the actual scam being perpetrated by the TM owners and inquired, "If even the TSRs themselves are often not aware of a fraud, how could you possibly be expected to recognize one?" The writer then answered his own question by listing particular telephone solicitations to "watch out for," including home employment, government jobs, auction access, club memberships, all investments, time shares, "and especially 'free cruises and vacations.' " The article closed with another protestation about the intrinsic decency of the TSRs, themselves: "Most ironically, sales people themselves are known to be an 'easy touch' and the biggest 'mooches' [(injured buyers)] of all."

The "TELECON" article was scheduled to be published as the cover story in the March 8 through March 14, 2000, Volume 6, Creative Loafing Savannah. The business manager of CLS, Dewitt Clinton Mosby IV, deposed that during a "brainstorming" session on the Friday before the Monday publication deadline, cover art for the article was discussed, and "someone suggested that if it's about telemarketing, we should use Paulette [Collins]." Initially, it was suggested that a photograph of Collins be used on the cover, but Collins overheard the suggestion, and "her statement was that she wouldn't give us a photograph of herself for the cover." Apparently, a

cartoon illustration using Collins' likeness was then discussed. Collins was disturbed by this and called the Corporate Director of Classifieds CL-Atlanta, Howard Hall, to complain; she told Hall that she would "sue them if they run it." At approximately 5:00 p.m. that same Friday, Hall called Mosby and related Collins' concerns. Hall testified by deposition that Mosby "said at this point, it's too far gone and we can't pull it."

The cartoon illustration was done over the weekend; the artist "had gone with the suggestion of Paulette Collins" and had created a cartoon image with "a general likeness" of Collins. Mosby first saw the image after it was "scanned in to produce the cover at 4:30 on Monday, an hour before we went to press." Mosby deposed that he thought the cover illustration was "really cool. . . . That's why I went and showed it to her [(Collins)]." Mosby testified that Collins "laughingly" told him "if we ran that cover she would sue us." Perhaps because of the "nonchalant" way in which such statement was made, or perhaps because "[a]t 4:30 on Monday, we damn well better be close to being done with the paper[,]" Mosby did not take Collins seriously. The disputed cartoon illustration was published on the cover of March 8 through March 14, 2000, Volume 6, Creative Loafing Savannah.

By the day following publication, Collins had read the article about TM practices. Although it is undisputed that the article had absolutely nothing to do with Collins or the advertisement sales she performed for CLS, Collins was extremely disturbed that a cartoon image favoring her likeness was used in relation to the story. Mosby testified that Collins "was upset and she believed we tried to put her in a bad light." Collins asserted that she never gave permission for CLS to use her likeness, and she demanded a published retraction and apology. Such was not forthcoming.

Collins gave notice and terminated her employment with CLS. The instant suit followed. The record contains, inter alia, the disputed cartoon illustration and photographs of Collins attempting to facially mirror the cartoon. Upon motion and without findings of fact or conclusions of law, the trial court granted summary judgment to CLS and dismissed Collins' complaint. *Held*:

1. Collins contends the trial court erred in granting summary judgment to CLS. She claims that her likeness on the cover of the newspaper along with the headline "TELECON" and the article's discussion of fraudulent telemarketing practices is sufficient to raise the inference that she engages in criminal activity and thus sustain her complaint for libel and libel per se. We disagree.

To prevail on its motion for summary judgment, CLS must show that there is no evidence sufficient to create a jury issue on at least one essential element of Collins' case. If there is no evidence suffi-

cient to create a genuine issue as to any essential element of Collins' claim, that claim "tumbles like a house of cards. All of the other disputes of fact are rendered immaterial."[2]

In that regard, our Code defines libel as "a false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule."[3] Further,

> [t]o sustain an action for libel, the allegedly defamatory words [or picture] must refer to some ascertained or ascertainable person, and that person must be plaintiff. If the words [or picture] used really contain[s] no reflection on any particular individual, no averment or innuendo can make them defamatory. An innuendo can not make the person certain which was uncertain before.[4]

(a) In this case, the illustration at issue is a cartoon character without identification. Both the cartoon and Collins are female and have dark hair, bangs, and glasses. The cartoon, however, is a gross exaggeration of a human face; the face has two antennae-like pencils sticking out of its head, four hands holding telephones to unseen ears, and a cigarette hanging out of a gaping mouth.[5] It is unrecognizable as a "real person" and does not really reflect on any particular individual.[6] Indeed, there is no evidence of record that any person recognized the disputed cartoon face as that of Collins simply by viewing it. Even Hall, Collins' mentor and immediate supervisor to whom she turned for help in this case, deposed, "I'm not certain, in my own mind, that this is a caricature of Paulette Collins, although there are characteristics of the caricature that are similar to her personal characteristics." While Collins repeatedly states that her general likeness was used as the cartoon's creative foundation, this averment — even if true — is insufficient to create a jury issue when the cartoon would be unrecognizable as Collins absent such averment.[7]

(b) "In considering whether a writing is defamatory as a matter of law, we look at what construction would be placed upon it by the average reader."[8] Here, the offending headline, "TELECON," appears

---

[2] (Citation omitted.) *Hansen v. Cooper*, 253 Ga. App. 533, 535 (559 SE2d 740) (2002).

[3] OCGA § 51-5-1 (a).

[4] (Citation and punctuation omitted.) *Armscorp of America v. Daugherty*, 191 Ga. App. 19, 20 (380 SE2d 729) (1989).

[5] It is undisputed that Collins does not smoke cigarettes while on the telephone.

[6] *Armscorp of America v. Daugherty*, supra at 20.

[7] Id.; *Cox Enterprises v. Bakin*, 206 Ga. App. 813, 816 (1) (426 SE2d 651) (1992); *Fiske v. Stockton*, 171 Ga. App. 601, 602 (1) (320 SE2d 590) (1984).

[8] (Citation and punctuation omitted.) *Cox Enterprises v. Nix*, 274 Ga. 801, 803 (560 SE2d 650) (2002).

to refer to author Mark Wirtz, the "Former Insider Tak[ing] You Inside the Brutal World of Telemarketing." Wirtz is a male, but the disputed cartoon is (ostensibly) female and thus does not illustrate Wirtz, i.e., the "TELECON." If the cartoon is reflective of anything in the headline, it would appear to be the general chaos engendered by "The Brutal World of Telemarketing."

(c) A publication that is claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it.

> So the whole item should be read and construed together, and its meaning and signification thus determined. When thus read, if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not.[9]

After consideration of the article on which Collins' suit is based, we conclude that a jury issue is not presented in this case. The contents of the article do not even remotely reflect on Collins. Not only is Collins' name never used, she is not even a TSR as such position is contemplated and defined in the article. Contrary to the TSRs described in the article, Collins maintains a steady client base and strong customer relationships therewith; she sold advertising space for a stable company that is accountable to its advertising clients as well as to its employees. These facts, alone, remove her from the purview of TSR employment addressed in the "TELECON" article where the TSRs have no access to information about the businesses they represent, "especially as the location of the 'front office' is a mystery and typically unknown miles away from the phone room," and "the race is to make as much money as possible . . . before vanishing without a trace."

> [A]s to [Collins], the article is not ambiguous and can reasonably have but one interpretation, and that interpretation does not include a statement, implication, or suggestion that [Collins] was engaged in criminal conduct.[10]

In sum, it appears from the record that Collins believed her CLS colleagues analogized her employment to that of the TSRs discussed in the "TELECON" article because those colleagues allowed the cover art for the article to be based on her likeness, albeit loosely. Clearly, she was personally offended by this decision. In her letter demanding

---

[9] (Citation and punctuation omitted.) *Fiske v. Stockton*, supra at 602 (1).

[10] (Punctuation omitted.) *Cox Enterprises v. Nix*, supra at 803.

apology and retraction, Collins states that the cover cartoon was "a slap in the face, a real eye opener. So this is what some of my co-workers think of me." As a matter of law, however, personal offense alone does not create a basis for libel — no matter how legitimate the origin for such offense may appear to be.

Because (a) the exaggerated cartoon character in the instant case is not recognizable as Collins, and there is no evidence that any person recognized it as Collins; (b) the headline, "TELECON," did not refer to Collins but to, if anybody, "former insider" Wirtz; and (c) the content of the "TELECON" article did not in any way reflect upon Collins or her employment, we find no error in the trial court's grant of summary judgment to CLS on Collins' claims of libel and libel per se.

2. For the reasons discussed in Division 1, supra, the trial court properly granted summary judgment to CLS on Collins' claims of invasion of privacy — false light and appropriation.

3. Based on the evidence in the record, the court did not err in concluding as a matter of law that Collins' assertions about (a) an unidentifiable cartoon loosely based upon her likeness, (b) a headline that did not refer to her, and (c) an article concerning fraudulent telemarketing practices that in no way reflected upon Collins or her employment did not rise to the requisite level of outrageousness and egregiousness so as to sustain a claim for intentional infliction of emotional distress.[11] Accordingly, summary judgment was warranted on such claim.

*Judgment affirmed. Ruffin, P. J., and Adams, J., concur.*

DECIDED DECEMBER 12, 2003.

*Neal H. Howard & Associates, Neal H. Howard, William D. James*, for appellant.

*Cynthia L. Counts*, for appellee.

---

[11] *Reece v. Chestatee State Bank*, 260 Ga. App. 136, 141-142 (2) (579 SE2d 11) (2003).