A11A1115, A11A1116. CITY OF COLLEGE PARK v. GEORGIA INTERLOCAL RISK MANAGEMENT AGENCY; and vice versa.
(721 SE2d 97)

PHIPPS, Presiding Judge.

The City of College Park was sued by a subcontractor, which complained that it had not been paid for work it performed on College Park's property. College Park, a participant in the Georgia Interlocal Risk Management Agency (GIRMA),[1] submitted a claim to GIRMA seeking a defense and indemnity. GIRMA denied the claim. College Park filed suit against GIRMA, alleging breach of contract and seeking attorney fees. On cross-motions for summary judgment, the trial court ruled in favor of College Park with respect to the breach of contract claim; the court ruled in favor of GIRMA on the attorney fees claim.

These appeals challenge those rulings. In Case No. A11A1115, College Park contests the denial of its claim for attorney fees; in Case No. A11A1116, GIRMA maintains it was entitled to summary judgment on the breach of contract claim. Because College Park failed to show that GIRMA was contractually obligated to provide a defense and indemnity, we reverse the trial court's judgment pertaining to the breach of contract claim and affirm the judgment with respect to the attorney fees claim.

The relevant facts are not in dispute. In 2005, College Park hired a contractor, Southern Products, Inc., to perform repairs to some of its sewer pipes. In turn, the contractor hired Sekisui SPR Americas,

---

[1] See OCGA § 36-85-1 et seq. (providing for an arrangement among municipal governments to, inter alia, pool their general liability risks); *Ga. Interlocal Risk Mgmt. Agency v. Godfrey*, 273 Ga. App. 77, 78 (614 SE2d 201) (2005) (although not an insurance company or "insurer" governed by Title 33 of the Georgia Code, GIRMA provides a mechanism for municipalities to pool their general liability, motor vehicle liability, and property damage risks; a municipality that enters a GIRMA coverage agreement in effect purchases liability insurance).

LLC to serve as a subcontractor on the project. In September 2005, Sekisui sent its first invoice to Southern Products in the amount of $18,646.79, which Southern Products paid after it submitted its application for payment to College Park. In October and December 2005, Sekisui sent second and third invoices to Southern Products in the amounts of $82,829.24 and $231,339.15, which were not paid to it either by Southern Products or by College Park. College Park, however, paid the entire amount it owed to Southern Products for services rendered on the project.

Consequently, Sekisui filed suit against Southern Products for breach of contract. After apparently determining that Southern Products had ceased operating and was insolvent, Sekisui filed suit against College Park, seeking damages in the amount owed it ($314,168.39), but not paid due to Southern Products' alleged breach of contract. Among the causes of action set forth in its lawsuit,[2] Sekisui alleged that College Park had failed to obtain a payment bond or other security in violation of the Georgia Local Government Public Works Construction Law.[3]

College Park tendered the claim against it to GIRMA pursuant to their Member Coverage Agreement. GIRMA denied the claim, citing an exclusion clause in that Agreement.

This action ensued. College Park filed a complaint against GIRMA, alleging that GIRMA had wrongfully denied the claim it submitted, that it (College Park) had been forced to litigate the case Sekisui filed against it, and that it had incurred formidable costs. College Park set forth in its complaint three separate counts: breach of contract, declaratory judgment, and attorney fees. College Park next filed a motion for summary judgment. Therein, it sought a ruling that the claim submitted to GIRMA was covered under their Agreement; it sought a ruling as to liability on the breach of contract claim, specifically that GIRMA had breached its duty to provide a

---

[2] Additionally, Sekisui's complaint asserted theories of unjust enrichment, quantum meruit, and implied obligation to pay under OCGA § 9-2-7. Sekisui also sought attorney fees under OCGA § 13-6-11, alleging that College Park had acted in bad faith. We focus herein on Sekisui's claim that College Park violated the Georgia Local Government Public Works Construction Law, because that claim was College Park's focus in its quest for GIRMA to provide coverage under the Agreement.

[3] See OCGA § 36-91-1 et seq.; see, e.g., OCGA §§ 36-91-90 (setting forth requirement for payment bond or other security acceptable in lieu of a payment bond); 36-91-91 ("If a payment bond or security deposit is not taken in the manner and form required in this article, the corporation or body for which work is done under the contract shall be liable to all subcontractors and to all persons furnishing labor, skill, tools, machinery, or materials to the contractor or subcontractor thereunder for any loss resulting to them from such failure."). See generally *B & B Elec. Supply Co. v. H. J. Russell Constr. Co.*, 166 Ga. App. 499, 501 (304 SE2d 544) (1983) (payment bond requirement was "for the use and protection of subcontractors supplying labor and materials in the prosecution of the work on the public project") (citation omitted).

defense under the Agreement; and it sought a ruling that, because of GIRMA's conduct, GIRMA should be required to pay College Park's attorney fees.

In its motion for summary judgment, GIRMA argued that it had not breached the Agreement because the Agreement did not provide for the coverage demanded by College Park and that College Park was therefore not entitled to attorney fees.

After a hearing on the motions,[4] the trial court entered an order granting College Park's motion for partial summary judgment on the breach of contract claim, thus determining that the Agreement provided coverage for the claim. The trial court granted summary judgment in GIRMA's favor on the attorney fees claim.

"[T]o prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact, so that the party is entitled to judgment as a matter of law."[5] "In our de novo review of the grant of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant."[6]

Because our decision in Case No. A11A1115 turns on our resolution of Case No. A11A1116, we address the latter case first.

### Case No. A11A1116

1. Citing cases such as *Drawdy v. Direct Gen. Ins. Co.*,[7] GIRMA contends that "[t]he trial court lacked subject matter jurisdiction to enter a declaratory judgment." Pretermitting whether GIRMA waived this contention by not raising it below, we find it unavailing.

Nomenclature aside,[8] it is clear from the record that College Park did not seek merely the entry of a declaratory judgment.[9] After GIRMA denied College Park's claim, College Park sought recourse by

---

[4] At the hearing, GIRMA's counsel represented that Sekisui's lawsuit against Southern Products remained pending, because Southern Products was no longer in business. And College Park's counsel represented that Sekisui's lawsuit against College Park remained pending, awaiting a ruling in the instant case on the issue of coverage.

[5] *Cowart v. Widener*, 287 Ga. 622, 623 (1) (a) (697 SE2d 779) (2010) (citations and punctuation omitted).

[6] Id. at 624 (1) (a) (citation and punctuation omitted).

[7] 277 Ga. 107, 109 (586 SE2d 228) (2003) (where insurer had already denied coverage for claims at issue, declaratory judgment was not available to *insurer* because it was neither uncertain nor insecure with regard to its rights, status or legal relations).

[8] See *Planet Ins. Co. v. Ferrell*, 228 Ga. App. 264, 266 (491 SE2d 471) (1997) (pleadings, motions, and orders are to be construed according to their substance and function and not merely as to their nomenclature).

[9] *Kirkland v. Morris*, 233 Ga. 597, 598 (212 SE2d 781) (1975) ("The distinctive characteristic of a declaratory judgment is that the declaration stands by itself and does not seek execution or performance by the defendant. Ordinary judgments, on the other hand, grant consequential or curative relief in some form.") (citations omitted).

filing a lawsuit against GIRMA asserting, inter alia, a breach of contract theory. Regarding the essential element of "breach,"[10] College Park alleged that GIRMA had a duty to provide coverage for the claim, but refused to do so. To test the merits of that breach of contract claim, the parties filed their respective summary judgment motions.[11] The trial court was authorized to decide the issues presented thereby.[12] Contrary to GIRMA's contention, cases such as *Drawdy* do not provide for a conclusion that the trial court's rulings were not authorized.[13]

2. GIRMA contends that it is entitled to summary judgment on College Park's breach of contract claim. Challenging the trial court's rulings with respect thereto, GIRMA maintains that the Agreement excluded coverage of the claim submitted by College Park.

The Agreement provided coverage for any "Wrongful Act." The Agreement defined "Wrongful Act," in pertinent part, as "any actual or alleged error or misstatement, omission, act of neglect or breach of duty including misfeasance, malfeasance and non-feasance by [College Park] committed during the Coverage Agreement Period." GIRMA has conceded before the trial court and this court that College Park's claim fell within that particular language. Nevertheless, GIRMA maintains, it properly denied the claim because of an exclusion that coverage was not provided for any claim against College Park that was "arising out of or in any way connected with breach of contract."

According to GIRMA, Southern Products' breach of the subcontract with Sekisui invoked that exclusion; the origin of Sekisui's complaint against College Park was the contractor's breach of contractual duties owed the subcontractor; and but for that breach, College Park's claim would not have arisen. College Park countered that the claim was covered by the Agreement, pointing out that the subcontractor's lawsuit against *it* did not allege that *it* breached a contract. College Park pointed out further that it never had a contract with the subcontractor and that it was being sued by the

---

[10] See *Kuritzky v. Emory Univ.*, 294 Ga. App. 370, 371 (1) (669 SE2d 179) (2008) ("The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken.") (citation omitted).

[11] See *Ogden Equip. Co. v. Talmadge Farms*, 232 Ga. 614, 615 (208 SE2d 459) (1974) (a motion for summary judgment is designed to test the merits of the claim). Cf. *Planet Ins. Co.*, supra at 265 (noting that summary judgment will not lie as to issues the adjudication of which would not be dispositive in whole or in part of the merits of the case under consideration).

[12] See OCGA § 9-11-56 (c) ("A summary judgment may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damage."); *Ogden Equip. Co.*, supra.

[13] See generally *Drawdy*, supra.

subcontractor on a *noncontractual* theory of failure to comply with the payment bond statute. According to College Park, its claim to GIRMA did not fall within the cited exclusion because the subcontractor's suit against it "for failure to adhere to statutory bonding requirements . . . [did] not constitute action[ ] arising under a breach of contract."

For the following reasons, we agree with GIRMA that the trial court erred in determining that it was not entitled to summary judgment on College Park's breach of contract claim. First, the exclusionary language at issue stated that GIRMA was not obligated to provide coverage for any claim "arising out of or in any way connected with breach of contract." Sekisui's lawsuit against College Park sought payment from the city because it was not paid for work performed under the subcontract.[14] Although College Park established that Sekisui's complaint against it did not contain any breach of contract count, the exclusion at issue was not restricted by the particular theory of recovery alleged against College Park. That being the case, "the *underlying facts and circumstances* of the claim[s asserted], rather than the theory of the claim[s], determine whether or not the exclusion applies."[15] Consequently, College Park's position is not meritorious.

Second, a conclusion that the underlying facts and circumstances fell within the exclusionary language is supported by *Continental Cas. Co. v. HSI Financial Svcs.*[16] In that case, an insurance company had issued a policy extending professional liability insurance coverage to a law firm and its three named partners.[17] Coverage was provided for any "wrongful act," defined by the policy as "any negligent act, error or omission in . . . the rendering of or failure to render professional services."[18] The term "professional services" was defined as "services rendered in an insured's capacity as a lawyer . . . (including) acts as an administrator, conservator, executor, guardian, trustee, receiver, or in any . . . fiduciary activity."[19] Excluded from coverage, however, was "[a]ny claim arising out of any dishonest, fraudulent, criminal, or malicious act by (an insured) or any of (an insured's) partners,

---

[14] College Park and GIRMA stipulated before the trial court, "In both lawsuits [against (i) Southern Products and (ii) College Park], Sekisui seeks damages equal to the amount owed to it by Southern Products' breach of contract, interest on the unpaid amount, and its attorney's fees."

[15] *Video Warehouse v. Southern Trust Ins. Co.*, 297 Ga. App. 788, 792 (1) (678 SE2d 484) (2009) (citations and footnotes omitted; emphasis supplied).

[16] 266 Ga. 260 (466 SE2d 4) (1996).

[17] Id.

[18] Id.

[19] Id. at 260-261.

officers, stockholders, or employees."[20]

When a client of the law firm filed a lawsuit against the law firm and the three named partners, they forwarded the complaint to the insurer for the provision of a defense.[21] The complaint alleged that one of the named partners, Page, had improperly withdrawn funds from the client's escrow account for his personal use.[22] As there was no doubt that Page's theft of the escrowed funds fell within the exclusion,[23] at issue in *Continental Cas. Co.* were those counts of the complaint that charged negligence and legal malpractice against Page's two partners for their failure to supervise and ensure the proper accounting of the client's escrowed funds.[24] Hence, the question before the Court was framed:

> Does a claim for a law partner's negligence with respect to supervising and mitigating a fellow partner's criminal act "arise out of" "any dishonest, fraudulent, criminal or malicious act" within the meaning of this insurance policy exclusion?[25]

In answering this question in the affirmative,[26] the Court noted that (i) the theft by Page unquestionably fell within the exclusion relating to "dishonest, fraudulent, criminal and malicious act[s]"; and therefore, (ii) the client's claim against the other two law partners " 'arose out of' Page's actions, because *but for* Page's actions, there could be no claim against [his two partners]."[27] Additionally, the Court expressly rejected Page's partners' argument that, because the client's claims against them were based upon allegations that they negligently failed to supervise properly the client's accounts, such claims "assert[ed] independent and concurrent causes of [the client's] loss, for which coverage must be provided."[28] The Court explained:

> [T]his argument misses the mark, because the exclusionary

---

[20] Id. at 261.

[21] Id.

[22] Id.

[23] Id. at 262.

[24] Id. at 261.

[25] Id.

[26] Id. at 261-262.

[27] Id. at 262 (emphasis supplied); see generally *Carver v. Empire Fire &c. Ins. Co.*, 270 Ga. App. 100, 102-103 (605 SE2d 842) (2004) (noting that the Supreme Court of Georgia interpreted in *Continental Cas. Co.*, supra, "an event 'arising out of' [an] . . . action to constitute an event that would not have occurred *but for* the . . . action") (emphasis supplied).

[28] *Continental Cas. Co.*, supra at 262.

clause is not at all concerned with whether ancillary acts of less culpable partners may have contributed to the loss which [the client] suffered as a result of Page's actions. Rather, by its express terms, the exclusionary clause is focused solely upon the genesis of [the client's] claims — if those claims *arose out of* Page's culpable conduct, as they did, then coverage need not be provided.[29]

Likewise, in this case, the exclusionary clause — "arising out of or in any way connected with breach of contract" — was not at all concerned with whether an ancillary act, such as the failure to obtain a statutory bond or its equivalent, may have contributed to the loss which the subcontractor suffered as a result of Southern Products' breach of the subcontract. Here, by its express terms, the exclusionary clause focused on the genesis of the subcontractor's claims, and also more broadly, on whether the subcontractor's claims were in any way connected with breach of contract. Because the claims were encompassed by the Agreement's exclusionary clause, then coverage need not be provided by GIRMA.[30]

Third, this determination — that the subcontractor's claims against College Park were "arising out of or in any way connected with breach of contract" — comports with analysis employed in *Mayor &c. of Savannah v. Norman J. Bass Constr. Co.*[31] In that case, a nonresident subcontractor that had performed work on a city public works project sued the City of Savannah on the ground that the city had failed to obtain a bond as required by former OCGA § 36-82-102. Under that statute, if the city failed to take a payment bond in the required manner and form, then the city was "liable to all subcontractors . . . for any loss resulting to them from such failure."[32] Savannah moved to dismiss the action, pointing out that the nonresident subcontractor had failed to satisfy certain statutory provisions that allowed nonresident subcontractors to be "entitled to

---

[29] Id. (emphasis in original).

[30] See id.; *Eady v. Capitol Indem. Corp.*, 232 Ga. App. 711 (502 SE2d 514) (1998) (applying required "but for" analysis in examining "arising out of" language found in an exclusionary clause; ruling that coverage need not be provided because harm arose out of conduct that was within scope of exclusionary clause); *Dynamic Cleaning Svc. v. First Financial Ins. Co.*, 208 Ga. App. 37-38 (430 SE2d 33) (1993) (ruling that coverage need not be provided even though negligence was asserted as a concurrent cause of the harm suffered by an insured, because that harm arose out of conduct that was within the scope of an insurance policy exclusionary clause); see generally *Southgate Recreation and Park Dist. v. Cal. Assn. for Park and Recreation Ins.*, 106 Cal. App. 4th 293 (Cal. Ct. App. 2003).

[31] 264 Ga. 16 (441 SE2d 63) (1994).

[32] Id. at 16, n. 1 (punctuation omitted).

maintain an action to *recover payment for performance on the contract* in the courts of this state."[33] In ruling that dismissal was proper, the Court reasoned, "By its action against the City under [OCGA] § 36-82-102, [the nonresident subcontractor] seeks to recover payment due it for work it has performed under its subcontract";[34] further, the Court found irrelevant that the subcontractor had premised the city's liability for that payment upon an alleged failure to obtain a proper bond.[35]

Likewise, it is not dispositive in this case that the subcontractor premised College Park's liability upon an alleged failure to obtain a payment bond or other security acceptable in lieu thereof. Indeed, by its action against College Park for violating the Georgia Local Government Public Works Construction Law,[36] the subcontractor sought to recover payment due it for work it performed under its subcontract.[37]

Finally, College Park urges a conclusion in its favor under the principle that "if an insurance contract is capable of being construed two ways, it will be construed against the insurance company and in favor of the insured."[38] But it cannot be concluded that the exclusionary language at issue — "arising out of or in any way connected with breach of contract"[39] — is ambiguous.[40] That being so, our

---

[33] Id. at 16 (punctuation omitted; emphasis supplied).

[34] Id. at 18 (2).

[35] Id.

[36] See n. 3, supra.

[37] See n. 14, supra.

[38] *Claussen v. Aetna Cas. &c. Co.*, 259 Ga. 333, 334-335 (380 SE2d 686) (1989) (citations omitted).

[39] We note that the exclusion clause, in its entirety, states that coverage is not provided for any claim "arising out of or in any way connected with breach of contract; however, this exclusion does not apply to employment contracts." College Park has not made any argument to this court — either by brief or when expressly questioned by this court at oral argument — based upon this "employment contracts" exception to the exclusion. Nor has College Park asserted that any part of its argument to the trial court was based on such "employment contracts" exception. Our holdings herein are decided accordingly. See *Pfeiffer v. Ga. Dept. of Transp.*, 275 Ga. 827, 828-829 (2) (573 SE2d 389) (2002) (each party has a duty to present his best case on a motion for summary judgment; once a defendant points out there is an absence of evidence to support plaintiff's case, burden shifts to plaintiff to point to specific evidence giving rise to triable issue; appellate courts are courts for the correction of errors of law committed in the trial court; routinely, appellate courts refuse to review issues not raised in the trial court; to consider the case on a completely different basis from that presented below would be contrary to the line of cases holding, "He must stand or fall upon the position taken in the trial court."); *Reece v. Chestatee State Bank*, 260 Ga. App. 136, 140 (1) (579 SE2d 11) (2003) (issues presented for the first time on appeal furnish nothing for us to review, for this is a court for correction of errors of law committed by the trial court where proper exception is taken; one may not abandon an issue in the trial court and on appeal raise questions or issues neither raised nor ruled on by trial court).

[40] See *Hunnicutt v. Southern Farm &c. Ins. Co.*, 256 Ga. 611, 612 (4) (351 SE2d 638) (1987) (construction of an unambiguous contract is a question of law for the court); *Western*

conclusion accords with another principle: "if the policy exclusions are unambiguous they must be given effect 'even if beneficial to the insurer and detrimental to the insured.' "[41] "We will not strain to extend coverage where none was contracted or intended."[42]

Because College Park's claim fell within the scope of the exclusionary clause, GIRMA had no contractual duty to provide coverage therefor and thus did not breach the Agreement by denying College Park's claim.[43] In connection with College Park's breach of contract claim, the trial court erred in its rulings that the Agreement provided for coverage, that GIRMA's denial of College Park's claim constituted a breach of its duties under the Agreement, that College Park was entitled to partial summary judgment (as to liability), and that GIRMA's motion for summary judgment was not meritorious.[44]

### Case No. A11A1115

3. College Park contends that the trial court erred in granting summary judgment in GIRMA's favor with respect to the claim for attorney fees under OCGA § 13-6-11. Given our holdings in Divisions 1 and 2,[45] College Park has failed to show that it is entitled to attorney fees under that statute.[46] The trial court's judgment in that regard is affirmed.

*Judgment affirmed in Case No. A11A1115. Judgment reversed in Case No. A11A1116. Andrews and McFadden, JJ., concur.*

DECIDED OCTOBER 11, 2011 —
RECONSIDERATION DENIED DECEMBER 8, 2011 — 

*Fincher, Denmark & Williams, Winston A. Denmark, Emilia C. Walker, L'Erin F. Barnes,* for appellant.

---

*Pacific Mut. Ins. Co. v. Davies,* 267 Ga. App. 675, 680 (1) (601 SE2d 363) (2004) (a word or phrase is ambiguous only when it is of uncertain meaning, and may be fairly understood in more ways than one; an ambiguity involves a choice between two or more constructions of the contract). See also *Continental Cas. Co.,* supra at 263 (applying the plain meaning of the exclusionary language to conclude that the claim was within the scope of insurance policy exclusionary clause).

[41] *Pilz v. Monticello Ins. Co.,* 267 Ga. App. 370, 371-375 (599 SE2d 220) (2004), quoting *Jefferson Ins. Co. &c. v. Dunn,* 269 Ga. 213, 216 (496 SE2d 696) (1998).

[42] *Jefferson Ins. Co. &c.,* supra (citation omitted).

[43] See *Continental Cas. Co.,* supra at 263; *Eady,* supra; *Dynamic Cleaning Svc.,* supra; see generally *Southgate Recreation and Park Dist.,* supra.

[44] See *Cowart,* supra at 623 (1) (a).

[45] Supra.

[46] See *United Cos. Lending Corp. v. Peacock,* 267 Ga. 145, 147 (2) (475 SE2d 601) (1996) (a prerequisite to any award of attorney fees under OCGA § 13-6-11 is the award of damages or other relief on the underlying claim).

*James R. Westbury, Jr., Matthew H. Bennett*, for appellee.